# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

GEORGE DAVID JOHNSON and
ROBERTA JOHNSON,

Civil No. 02-1328 (JRT/FLN)

Plaintiffs,

v.

**MEMORANDUM OPINION
AND ORDER**

ZIMMER, INC.,

Defendant.

Robert I. Reardon, Jr. and Robert T. Rimmer, REARDON LAW FIRM, 160 Hempstead Street, P.O. Drawer 1430, New London, CT 06320, for plaintiffs.

Albert J. Dahm and Michael S. Elvin, DAHM & ELVIN, 9604 Coldwater Rd., Suite 201, Ft. Wayne, IN 46825; and Kim M. Schmid, BOWMAN & BROOKE, 150 South Fifth Street, Suite 2600, Minneapolis, MN 55402, for defendant.

Defendant Zimmer, Inc. ("Zimmer") designs and manufactures, among other products, prescription prosthetic devices including the Centralign precoated femoral hip stem. Plaintiff George David Johnson ("Johnson") received a Centralign hip implant in March 1997. The hip stem loosened, and in 2001 Johnson required a revisionary procedure. Johnson asserts that the Centralign is a defective product that caused the stem to loosen prematurely. He alleges claims of negligence, strict liability, and breach of express and implied warranties. Johnson's wife asserts a claim of loss of consortium.

# BACKGROUND[1]

Johnson was diagnosed in late 1995 with possible degenerative arthritis of the hip. He was eventually referred to an orthopedic surgeon, Dr. Knudsen. Dr. Knudsen examined Johnson and took a series of x-rays on December 13, 1996. The x-rays showed that Johnson's left hip had severely degenerated due to the arthritis, resulting in a complete loss of joint space. Although Johnson was younger than the typical hip replacement candidate, Dr. Knudsen concluded that the severity of Johnson's arthritis and related pain made Johnson an appropriate candidate for surgery. According to Dr. Knudsen, a hip implant could provide a person of Johnson's age relief for 25 to 30 years. Johnson and Dr. Knudsen discussed the risks and benefits of hip replacement surgery, including the possibility that the procedure might fail, might require earlier than anticipated correction, and that the stem attaching the implant to the femur might loosen. Johnson decided to go ahead with the surgery, and signed a consent and release acknowledging that he understood the risks of the procedure.

Dr. Knudsen chose to use a Centralign precoated femoral hip stem manufactured by Zimmer. The Centralign is a femoral stem forged from cobalt-chromium-molybdenum alloy with macro-surface texturing on portions of the stem, a collar near the proximal end, Plymethyl Methacrylate ("PMMA") spacers affixed to the proximal and distal sections of the stem, and PMMA precoating intended for cemented use. According

---

[1] These facts are gleaned from the submissions of the parties, and should not be taken as findings of the Court.

to Zimmer, the PMMA precoating forms a mechanical lock on the implant surface and enhances the adhesive bond between the implant and the bone cement.

The Centralign was available in six sizes. Dr. Knudsen determined that Johnson's femur/medullary canal would accommodate a size 3 stem. The size 3 stem is designed for a maximum body weight of 200 pounds. This is specified in the package insert provided by Zimmer. At the time of his operation, Johnson weighed 207½ pounds. Dr. Knudsen testified that he would have used the size 3 regardless of the maximum weight indication.

It is important that the implant be small enough to allow creation of a sufficient cement mantle. A uniform cement mantle provides the best chance of a good result. It is also important to center the stem in the canal in order to achieve maximum success. A non-continuous cement mantle, one with voids, and/or non-central placement of the stem in the medullary canal can lead to early loosening of the stem. Dr. Knudsen was apparently unable to centralize the stem in the canal. Rather, the stem was placed in a varus, or inwardly turned, position.

Manufacturing records for Johnson's Centralign reflect no design or manufacturing deviations and indicate that the device met specifications in all respects. Dr. Knudsen inspected the Centralign before surgery, and "saw no imperfections in the precoating." Dr. Knudsen did not see the package insert provided with Johnson's implant because he was "sterile" when it was opened. He also doubts that he had ever seen the package insert that accompanied the Centralign product.

Dr. Knudsen performed a cemented total hip replacement on Johnson's left hip on March 6, 1997. The surgery was initially successful, with Dr. Knudsen noting positive progress in the months following surgery. Dr. Knudsen did note a void in Johnson's cement mantle on a post-operative x-ray. In March 1998, Johnson had his final follow up with Dr. Knudsen. Johnson and Dr. Knudsen discussed the Centralign stem and problems that had arisen with its use. Dr. Knudsen was aware of some cases of early loosening of Centralign stems.

In January 2001, Johnson began experiencing left hip pain again, and visited a Dr. Welchin. Dr. Welchin x-rayed Johnson's left hip and observed an area that was neither bone, cement, or implant between the cement mantle and the cortical bone. Although he did not believe that the implant was clinically loose, Dr. Welchin nevertheless recommended a revision surgery, which was performed on February 28, 2001. When Dr. Welchin removed Johnson's stem, bone cement remained affixed to a portion of the stem.

According to Zimmer, Johnson's stem loosened because of an inadequate cement mantle at the time of initial placement, exacerbated by the placement of the stem in a varus position in the canal and the failure to use a distal centralizer. According to Johnson, the stem design is too small for the patients for whom it is recommended, and the coating and surfacing actually make the cement bond weaker rather than stronger and lead to premature loosening. Research has shown that the phenomenon of prosthesis cement debonding causes higher stresses within the cement mantle, which increases the likelihood of fracturing the cement mantle and causing failure at that interface. The

parties and their experts agree that loosening of a cemented femoral component is generally "multifactorial."

Johnson has brought claims of negligence, strict liability, and breach of express and implied warranty, supported in part by expert testimony from Dr. Robert Rose and Dr. Harold Zeliger. Zimmer moved to exclude these experts' testimony. United States Magistrate Judge Franklin L. Noel denied the motion and Zimmer appeals. Zimmer also moves for summary judgment on all claims. The Court will first address Zimmer's appeal, and then turn to Zimmer's motion for summary judgment.

## ANALYSIS

### I.   MOTION TO EXCLUDE

Zimmer moved to exclude the testimony of two of Johnson's experts, Dr. Robert Rose and Dr. Harold Zeliger, as unqualified and unreliable under Federal Rule of Evidence 702. The Magistrate Judge determined that both Dr. Rose and Dr. Zeliger "have information that will assist the trier of fact in understanding the evidence or determining a fact at issue," and denied Zimmer's motions. However, the Magistrate Judge limited the scope of Dr. Zeliger's testimony.

Zimmer is appealing the Magistrate Judge's order to the extent that it admitted any of the expert testimony. Zimmer argues that Johnson's experts are not qualified to offer the proffered opinions because a materials scientist is not qualified to opine on issues of medical causation reserved for physicians or orthopedic device designers and a polymer chemist is not qualified to opine on issues of orthopedic device design and clinical

performance.   Further, Zimmer argues that the experts' opinions lack "the twin benchmarks of reliability and relevance" because the experts performed no testing and had no methodology, developed the opinions solely for litigation, and never had published or otherwise subjected their opinions to review.

### A.    Standard of Review

"The standard of review applicable to an appeal of a magistrate judge's order on a nondispositive issue is extremely deferential." *Reko v. Creative Promotions, Inc.*, 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).  This Court will reverse such an order only if it is clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. LR 72.1(b)(2).

### B.    Application

The admissibility of expert testimony is governed by Rules 702 and 703 of the Federal Rules of Evidence.  Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted.  *See Lauzon v. Senco Prods. Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (citations omitted).  First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  Second, the proposed witness must be qualified.  Third, the proposed evidence must be reliable or trustworthy in the evidentiary sense, so that if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.  *Id.*  These requirements reflect the analysis enunciated by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), as codified in Rule 702.  The district court has a

"gatekeeping" obligation to make certain that all testimony admitted under Rule 702 "is

not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 597-98 (citing Fed. R. Evid.

104(a)). *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 146 (1999)

(extending *Daubert* to technical and other specialized expert testimony).

"Trial courts have substantial latitude to determine whether specific expert

testimony is reliable." *United States v. Reed & Sons P'ship*, 280 F.3d 1212, 1215 (8th

Cir. 2002); *In re Air Crash at Little Rock, Ark.*, 291 F.3d 503, 514 (8th Cir. 2002). Trial

courts should apply the principle that "[e]xpert testimony is admissible if it is reliable and

will help the jury understand the evidence or decide a fact in issue." *Hartley v. Dillard's,*

*Inc.*, 310 F.3d 1054, 1060 (8th Cir. 2002). "[A]n expert's testimony need not relate

directly to the ultimate issue that is to be resolved by the trier of fact, it only need be

relevant to evaluating a factual matter." *Smith v. BMW N. Am., Inc.*, 308 F.3d 913, 919

(8th Cir. 2002); *see also Clark v. Heidrick*, 150 F.3d 912, 915 (8th Cir. 1998) (experts

offering a global understanding of the possible causes of an injury are useful to a jury).

The Court's focus should be on whether the testimony is grounded upon

scientifically valid reasoning or methodology. *United States v. Dico, Inc.*, 266 F.3d 864,

869 (8th Cir. 2001). "As a general rule, the factual basis of an expert opinion goes to the

credibility of the testimony, not the admissibility, and it is up to the opposing party to

examine the factual basis for the opinion in cross-examination. Only if the expert's

opinion is so fundamentally unsupported that it can offer no assistance to the jury must

such testimony be excluded." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir.

2001) (internal citations and quotations omitted).

Expert testimony also must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" for the opinion to be useful to the jury. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). However, doubts regarding usefulness should generally be resolved in favor of admissibility. *Clark*, 150 F.3d at 915.

### 1.    Dr. Rose

It is not disputed that Dr. Rose is extremely well qualified in the fields of materials science and engineering. The Court also notes that Dr. Rose's qualifications include experience with materials science as it relates to bone and the various materials involved in the implant procedure involved in this case. Further, Dr. Rose has relevant experience with hip implants, although not recently. Dr. Rose offers the opinions that the femoral stem of the Centralign implant is defective and failed because "the design geometry of the metal component led to high interface stresses," there was "inadequate adhesion of the precoat layer due to defects at the metal-polymer interface," and there was "inadequate adhesion of the precoat layer because it was attacked by monomer during the curing of the cement." The Magistrate Judge concluded that Dr. Rose's opinions were within his experience and education in materials science and engineering, were based upon sufficient facts and data, are the product of reliable principles and methods, reliably applied to the facts, and are thus admissible. This Court agrees.

- 8 -

Zimmer complains that Dr. Rose's opinions are not based in any independent work or testing, and that Dr. Rose failed to adequately explain the data underlying his hypotheses. Dr. Rose testified that his opinions were based on basic scientific theory and generally accepted and well-documented studies. In *Kumho Tire*, the Court made clear that the reliability test under Rule 702 is an individualized test whose relevant factors will depend on the type of expertise at issue in a given case. *See Kumho Tire*, 526 U.S. at 150 (stating that in some cases "the relevant reliability concerns may focus upon personal knowledge or experience. ... [T]here are many different kinds of experts, and many different kinds of expertise.") (citations omitted). Failure to perform independent testing of a well-established principle, or to submit a conclusion based on long-accepted theories to peer review, does not render an opinion unreliable or inadmissible. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 720 (7th Cir. 2000).

Dr. Rose applied long established materials science and engineering principles to the materials and shape of Johnson's hip implant. His conclusions that a differently shaped implant might have had lower stresses, that the materials used were not as strong as Zimmer asserts, and that the various materials used may have interacted poorly with each other are clearly related to the question of whether the design of the Centralign implant was defective and unsafe. If Zimmer has information or an expert willing to testify that basic engineering principles do not apply inside the human body or that concepts of materials science proven outside the human body do not hold true inside the human body, Zimmer can certainly confront Dr. Rose with that information at trial and allow the jury to determine the proper answer.

Zimmer also complains that Dr. Rose ignored facts and literature contrary to his opinions, and failed to eliminate other possible causes for the failure of Johnson's implant. "The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility." *Bonner*, 259 F.3d at 930 (citation omitted). "Questions of conflicting evidence must be left for the jury's determination." *Id*. Further, an expert's opinion is not required to **resolve** an ultimate issue of fact. It need only contribute to the jury's understanding of the issue. Dr. Rose's opinions provide useful information relating to the design of the implant used in this case, and the materials used in manufacturing it. Dr. Rose's opinions also provide a possible explanation for the early failure of Johnson's implant. That Zimmer may have other information or another expert offering entirely contradictory opinions, does not render Dr. Rose's testimony inadmissible. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 2.    Dr. Zeliger

It is similarly undisputed that Dr. Zeliger qualifies as an expert in chemistry. The Magistrate Judge determined that Dr. Zeliger's opinion that the PMMA layer precoated onto the femoral stem was unstable was admissible because it is within his field of expertise, based upon sufficient facts or data, and the product of reliable principles and

methods applied reliably to the facts.[2] Zimmer's objections to Dr. Zeliger's testimony are similar to those directed at Dr. Rose. For all of the reasons discussed with respect to Dr. Rose's testimony, the Court is unable to discern any meritorious objection to Dr. Zeliger's testimony as narrowed by the Magistrate Judge. Rather, it appears that he was "merely applying well-established [chemistry] techniques to the particular materials at issue in this case." *Smith*, 215 F.3d at 720.

## C.    Conclusion

In short, the Magistrate Judge's order is not clearly erroneous or contrary to law. The parties submitted extensive briefing, and a lengthy hearing was held on this issue before the Magistrate Judge. During the hearing, the Magistrate Judge made it clear that he understood the language of Rule 702, as amended, to include and reflect *Daubert* and *Kumho Tire*. *See also Guyer v. Valmet, Inc.*, 2003 WL 22076608 (D. Minn. Sept. 2, 2003) (Rule 702 requirements codify *Daubert* analysis). He appropriately considered the content of the opinions presented by Drs. Rose and Zeliger, the basis for the opinions, and their usefulness to a jury. Zimmer's appeal of the Magistrate Judge's order is denied.

---

[2] The Magistrate Judge excluded several of Dr. Zeliger's opinions as beyond his chemistry expertise – namely that "the femoral stem was not properly tested prior to introduction, and was not made with appropriate quality control protocols" and that "Zimmer did not comply with regulatory approval requirements." Johnson has not appealed this portion of the order, and it is therefore affirmed.

## II.    Motion for Summary Judgment

### A.    Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is not appropriate if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *Id.*

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir. 1980). However, the nonmoving party may not merely rest upon allegations or denials in its pleadings, but it must set forth specific facts by affidavits or otherwise showing that there is a genuine issue for trial. *Forrest v. Kraft Foods, Inc.*, 285 F.3d 688, 691 (8th Cir. 2002).

- 12 -

**B.    Negligence**

Johnson's negligence claim rests on four theories:  defective design, defective/dangerous manufacture, failure to warn, and failure to train.  Zimmer contends that each of these theories fails because Johnson cannot demonstrate causation and, in any event, assumed the risks attendant with the hip implant procedure.  Additionally, Zimmer asserts that Johnson cannot make out a prima facie case under any of his theories.

**1.    Causation**

Causation is an indispensable element of Johnson's case, regardless of the theory under which he proceeds.  *J & W Enters., Inc. v. Economy Sales, Inc.*, 486 N .W.2d 179, 181 (Minn. Ct. App. 1992).  Zimmer asserts that Johnson cannot, as a matter of law, demonstrate causation because he does not offer **medical** expert testimony, does not offer any admissible expert testimony, and does not offer evidence excluding other possible causes for failure of product.

Under Minnesota law, expert testimony is required to prove causation in cases involving complex medical issues with which a jury is unlikely to have experience.  *Willert v. Ortho Pharmaceutical Corp.*, 995 F. Supp. 979, 983 (D. Minn. 1998) (citing *Stahlberg v. Moe*, 166 N.W.2d 340, 345 (Minn. 1969)).  Although the expert in a medical products liability case may be a medical doctor, this rule does not **require** the expert to be a medical doctor.  Many non-medical doctors work in the field of medical product design and development.  Common sense dictates that such persons could qualify as

- 13 -

experts concerning their products. In light of the Court's decision above to affirm the Magistrate Judge's order admitting the testimony of Drs. Rose and Zeliger, Johnson has submitted expert testimony regarding causation.

Additionally, Zimmer argues that Drs. Rose and Zeliger do not rule out non-product related causes of injury. It is undisputed that other possible causes exist for the loosening of Johnson's implant, including an inadequate cement mantle and suboptimal placement of the implant in the femur. Minnesota law requires a plaintiff to establish a link between the alleged defect and the injury sufficient to allow a jury to conclude that the defect caused the injury. *See, e.g., J & W Enters., Inc. v. Econ. Sales, Inc.,* 486 N.W.2d 179, 181 (Minn. Ct. App. 1992). Such a requirement does not necessarily require the plaintiff to exclude all possible other causes. Drs. Knudsen and Welchin both described the surgery as properly performed. Their testimony coupled with the testimony of Drs. Rose and Zeliger concerning the strength of the cement bond and shape of the stem would be sufficient to allow a jury to find for Johnson.

### 2.    Assumed Risk

Zimmer also argues that Johnson's negligence claim is barred by the doctrine of primary assumption of risk. Under Minnesota law, the doctrine of primary assumption of risk may operate to relieve a defendant of liability in a products liability action.[3] *Andren*

---

[3] Secondary assumption of the risk, on the other hand, "is a type of contributory negligence where the plaintiff voluntarily encounters a known and appreciated hazard created by the defendant without relieving the defendant of his duty of care with respect to such hazard." *Andren v. White-Rodgers Co.,* 465 N.W.2d 102, 104 (Minn. Ct. App. 1991) (citing *Armstrong v. Mailand,* 284 N.W.2d 343, 349 (Minn. 1979)).

*v. White-Rodgers Co.*, 465 N.W.2d 102, 105 (Minn. Ct. App. 1991).    However, "[a]pplication of the primary assumption of risk doctrine is uncommon." *Rusciano v. State Farm Mut. Auto. Ins. Co.*, 445 N.W.2d 271, 273 (Minn. Ct. App., 1989).

Primary assumption of risk can only apply when the plaintiff expressly or implicitly manifests consent to relieve the defendant of that duty. *Schneider v. Erickson*, 654 N.W.2d 144, 149 (Minn. Ct. App. 2002) (citing *Armstrong v. Mailand*, 284 N.W.2d 343, 351 (Minn. 1979)). "[N]ot every deliberate encountering of a known danger ... is reasonably to be interpreted as evidence of such consent." *Iepson v. Noren*, 308 N.W.2d 812, 815 (Minn. 1981) (quoting Prosser, Handbook of the Law of Torts § 68 (4th ed. 1971) (stating that even a jaywalker who dashes in front of speeding cars "does not manifest consent that they shall use no care and run him down. On the contrary, he is insisting that they shall take immediate precautions for his safety.")).

In this case, Zimmer argues that Johnson knew and consented to the "risks of surgery, including the risk that the stem would loosen; that the procedure might fail; and that [he] would need revision surgery."    While Johnson may have consented to the ordinary risks associated with surgery or with a prosthetic implant, there is no evidence that Johnson expressly or implicitly relieved Zimmer of the duty to design and manufacture a safe product or otherwise care for his safety.    The doctrine of primary assumption of risk is not applicable in this instance.

### 3.    Defective Design[4]

In a products liability case, a plaintiff must demonstrate that (1) the product was in a defective condition unreasonably dangerous for its intended use, (2) the defect existed when the product left the manufacturer's control, and (3) the defect proximately caused the plaintiff's injuries. *Patton v. Newmar Corp.*, 538 N.W.2d 116, 119-20 (Minn. 1995) (citations omitted). A product is "in a defective condition unreasonably dangerous for its intended use" if "the manufacturer fails to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended, as well as an unintended yet reasonably foreseeable use." *Mozes v. Medtronic, Inc.*, 14 F. Supp. 2d 1124, 1127 (D. Minn. 1998) (quoting *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 621 (Minn. 1984)). Zimmer alleges that Johnson's defective/dangerous product design claim must fail because (1) any hip prosthesis is inherently unsafe to some degree, but the Centralign is not unreasonably unsafe, and (2) Johnson fails to provide evidence of a safer alternative design. For the following reasons, Zimmer's motion for summary judgment is denied with respect to this theory.

### a)    Unreasonably Dangerous

The hallmark of a products liability claim under Minnesota law is proof that a product is "defective" and "unreasonably dangerous." *see Holm v. Sponco*, 324 N.W.2d

---

[4] The Minnesota Supreme Court has determined that strict liability and negligent defective design claims are properly analyzed using the same standard. *Bilotta v. Kelley Co.*, 346 N.W.2d 616, 622 (Minn. 1984). The following analysis therefore applies both to Johnson's strict liability defective design claim and to his negligent design claim.

207, 212-213 (Minn. 1982). In determining what constitutes "unreasonably dangerous," the Minnesota Supreme Court "rejected the 'consumer expectation' standard of strict liability in favor of a negligence-like 'reasonable care' standard which focuses on the conduct of the manufacturer rather than the condition of the product." *Kociemba v. G.D. Searle & Co.*, 695 F. Supp. 432, 434 (D. Minn. 1988) (citing *Holm*, 324 N.W.2d at 212-213). The central inquiry of this reasonable care balancing test focuses on whether the manufacturer's choice of design "struck an acceptable balance among several competing factors" including risk and utility to the consumer.[5][6]  *Bilotta*, 346 N.W.2d at 622

---

[5] This balancing test is included in the Restatement (Second), Torts: Products Liability, § 402A, cmt. k. Section 402A provides in relevant part:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

   (a) the seller is engaged in the business of selling such a product, and

   (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

Comment k recognizes that "[t]here are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use" and provides that "the seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use."

[6] The reasonable care balancing test is also present in Section 6(c) of the Restatement (Third) of Torts, Product Liability, which states:

A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

Minnesota has not adopted the Restatement (Third) of Torts, Products Liability.

(quoting *Holm*, 324 N.W.2d at 212); *see also Kallio v. Ford Motor Co.*, 407 N.W.2d 92, 98 (Minn. 1987).

Zimmer argues that the risks associated with the Centralign are so minimal that they cannot outweigh its utility, and even if the risks are great, the potential benefits still outweigh them. Zimmer supports its argument by asserting that the Centralign was developed and manufactured according to the best available state-of-the-art technology and in compliance with guidelines and regulations. Further, according to deposition testimony presented by Zimmer, the Centralign has performed well clinically for a number of doctors in a number of patients. Additionally, according to Zimmer, "the Centralign's specific design features, such as its precoating, surface morphology and centralizers, have demonstrated laboratory and clinical success with the Centralign and other contemporary stems that share these design features."

On the other hand, Johnson's experts have clearly opined that the Centralign is defective and unreasonably dangerous – that is, taking into account the regular occurrence of eventual failure, the Centralign fails within an unacceptably short timeframe because of its unstable PMMA precoat layer and design and shape. Drs. Rose and Zeliger have offered opinions that the failure of Johnson's Centralign implant could be attributable to these defects. As discussed above, it is the province of the jury to consider this conflicting factual evidence and determine whether the risks are outweighed by the benefits.

### b) Safer Alternative Design

Zimmer also argues that the Centralign is not unreasonably dangerous because Johnson cannot prove the existence of a feasible, alternative design that would have avoided or materially reduced Johnson's injury. Zimmer asserts that Johnson has not offered any evidence of a "safer" prosthetic hip implant – that is, one that is less likely to loosen, or less likely to loosen as quickly as the Centralign.[7]

"To establish a prima facie case that [the product in question] was unreasonably dangerous normally requires production of evidence of the existence of a feasible, alternative safer design." *Bruzer v. Danek Medical, Inc.*, 1999 WL 613329 (D. Minn. 1999) (quoting *Kallio*, 407 N.W.2d at 96). While such evidence is relevant to and may be an important factor in a finding of unreasonable dangerousness, "existence of a safer, practical alternative design is not an element of an alleged defective product design prima facie case." *Kallio*, 407 N.W.2d at 97.

Johnson has submitted evidence to the effect that the cement/metal interface on Centralign implants debonds, or fails, unacceptably quickly. This result is contrary to Zimmer's representations that the special precoating and texturing of the Centralign

---

[7] Zimmer also asserts that "in order to conclude that a cemented femoral component with a different design is "safer," one would need to control for all those different variables and somehow conclude that another stem in that particular patient, keeping constant all other variables such as the placement of the stem, the quality of the cement mantle, and the patient's activity level, would have lasted a longer number of years." Such a conclusion would, according to Zimmer, be entirely hypothetical and speculative and thus inadmissible. The Court disagrees. Zimmer's position would essentially eliminate all medical products liability claims by requiring a plaintiff to prove that the defendant had considered a person identical to plaintiff and then designed a product unsafe for that person. That the product must be defective and **unreasonably** dangerous encompasses the notion that a company cannot **reasonably** design a product that takes into account and is an optimal fit for every person who might use it.

"nearly triple the fatigue strength of the cement/metal interface" and result in better clinical outcomes. The logical implication is that a design that did not include the special precoating and texturing might perform better because the cement/metal interface would not debond. Zimmer clearly would have been able to omit the precoating and texturing. Further, Johnson's expert Dr. Rose stated that larger, longer stems would be preferable alternative design features because such a design would "produce less interface stress" making the bonding "less likely to fail." Dr. Rose identified two actual larger stemmed implants, both of which were also manufactured by Zimmer.

Zimmer may have evidence demonstrating that the changes suggested by Johnson's evidence would not have made a difference. However, it is up to a jury, not this Court, to weigh that evidence and decide whether the Centralign was unreasonably dangerous.

### 4.    Failure to Warn[8]

In a products liability action based on failure to warn, whether there is a duty to warn of a danger in a product is a question of law. *Germann v. F.L. Smithe Mach. Co.*, 395 N.W.2d 922, 924 (Minn. 1986). If a legal duty to warn is found, the factual issues of the adequacy of the warning, breach of the duty, and causation are then considered by the factfinder. *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987). However, where an

---

[8] The Minnesota Supreme Court has determined that strict liability and negligent failure to warn claims are properly analyzed using the same standard. *Bilotta*, 346 N.W.2d at 622. The following analysis therefore applies both to Johnson's strict liability failure to warn claim and to his negligent failure to warn claim.

adequate warning could not have prevented a plaintiff's injuries, causation does not exist as a matter of law. *Id.*; *see also Hauenstein v. Loctite Corp.*, 347 N.W.2d 272, 276 (Minn. 1984) (if injured plaintiff would not have acted any differently had there been warning, manufacturer's failure to warn is not cause of injury); *J & W Enters. v. Econ. Sales*, 486 N.W.2d 179, 181 (Minn. Ct. App. 1992) (failure to read warning precludes claim that warning was inadequate); *Krein v. Raudabough*, 406 N.W.2d 315, 320 (Minn. Ct. App. 1987) (lack of evidence that plaintiff would have acted differently with warning precludes claim for failure to warn); *Marko v. ALCOA*, 1994 WL 615004, *2 (Minn. Ct. App. 1994) (plaintiff's testimony that it was his practice not to read warning and did not read the warnings included precluded claim for failure to provide sufficiently detailed warning).

In the context of the medical field, Minnesota has recognized the learned intermediary theory. Under this theory, a manufacturer can satisfy its duty to warn by supplying the plaintiff's physician with an adequate warning of hazards and risks. *See Gray v. Badger Min. Corp.*, ___ N.W.2d ___, 2004 WL 527781, *6 (Minn. Mar 18, 2004) (recognizing theory for prescription drugs, declining to extend to general employer/employee context); *Borka v. Emergency Physicians Prof'l Ass'n*, 379 N.W.2d 682 (Minn. Ct. App. 1986); *Mulder v. Parke Davis & Co.*, 181 N.W.2d 882 (Minn. 1970); *Lhotka v. Larson*, 238 N.W.2d 870 (Minn. 1976); *see also Todalen v. U.S. Chem. Co.*, 424 N.W.2d 73, 79 (Minn. Ct. App. 1988), overruled on other grounds by *Tyroll v. Private Label Chems., Inc.*, 505 N.W.2d 54 (Minn. 1993). In this case, any duty to warn

that Zimmer may have had could have been satisfied by adequately warning Johnson's physician.

Johnson's surgeon, Dr. Knudsen, testified in deposition that he did not either see or share with Johnson any warnings that were included in the Centralign package insert. Dr. Knudsen also testified that he had never, in any context, seen the warnings provided with the Centralign product. Thus, regardless of any inadequacy of the warnings and instructions included with Johnson's Centralign, causation does not exist as a matter of law. Summary judgment will therefore be granted in favor of Zimmer on this theory.

###    5.    Manufacture

Negligence and strict liability are distinct theories in manufacturing flaw cases. *Bilotta*, 346 N.W.2d at 622. However, under either theory, the focus is on the condition of the product at the time the manufacturer distributes it. *Id.* The crux of the claim is that the product, as provided to the public, was defective because the manufacturing, assembly, inspection, packaging, or testing processes failed to turn out the product intended by the defendant manufacturer. *Swanson v. Timesavers, Inc.*, 1997 WL 104917, *3 (Minn. Ct. App. 1997); *see also* 4A Minn. Prac., Jury Instru. Guides – Civil CIVJIG 75.30 (4th ed.). The degree of defect is measured by comparison to a flawless version of the same product. *Bilotta*, 346 N.W.2d at 622.

In this case, there is no evidence that the Centralign implanted in Johnson was in any way flawed. Indeed, his surgeon testified that he visually inspected the Centralign before beginning the procedure and did not notice any flaws. Zimmer presented evidence

- 22 -

that its manufacturing and inspection processes were adequate, and that the Centralign implanted in Johnson met specifications. Further, in light of the Magistrate Judge's decision excluding some portions of Dr. Zeliger's testimony, there is no evidence that Zimmer's manufacturing processes were substandard or defective. Thus, Johnson cannot make out a prima facie case of either strict liability or negligent manufacturing. Summary judgment is granted in favor of Zimmer on this theory.

### 6.    Failure to Train

Minnesota recognizes three negligent employment causes of action – negligent hiring, negligent retention, and negligent supervision. *M.L. v. Magnuson*, 531 N.W.2d 849, 856 (Minn. Ct. App. 1995). Neither party has provided, and the Court has not found, any Minnesota case law recognizing negligent failure to train, apart from a claim for negligent supervision, an independent cause of action outside the context of municipal liability under 42 U.S.C. § 1983.[9] *See Langehaug v. Mary T., Inc.*, 1999 WL 31182, *4 n.2 (Minn. Ct. App. Jan. 26, 1999); *Fletcher v. St. Paul Pioneer Press*, (Minn. Ct. App. June 27, 1995); *Hermeling v. Montgomery Ward & Co., Inc.*, 851 F. Supp. 1369, 1381 n.11 (D. Minn. 1994). However, in the event that such a cause of action exists, it necessarily entails the failure of the employer, through inadequate or non-existent training, to take reasonable precautions to prevent the foreseeable misconduct of its employees causing harm to others. *See Magnuson*, 531 N.W.2d at 856 n.3 (discussing basis for negligent employment theories).

---

[9] There is similarly no evidence that Minnesota recognizes a strict liability failure to train theory.

Johnson's complaint asserts that Zimmer "fail[ed] to properly train and instruct its agents, salesmen and distributors in the proper use and/or dangers and limitations in said implant." In a letter to the Court dated February 25, 2004, Johnson advised the Court that he intended to pursue the claim and would support his allegations through "testimony from, among others, Timothy H. Walker, a Zimmer sales associate, and David Weidenbenner, Zimmer's Director of Brand Management and Commercialization Efforts for Hips." Walker and Weidenbenner were apparently deposed in connection with similar litigation proceeding in Connecticut. While the parties have agreed to use certain expert deposition testimony taken in the Connecticut proceeding in this action, there is no indication that such an agreement was reached with respect to Walker and Weidenbenner. Further, in response to Zimmer's interrogatories, Johnson did not list either Walker or Weidenbenner as having knowledge relevant to his negligence claims. Finally, there is no evidence before the Court that either Walker and Weidenbenner have any information related to Zimmer's training and supervision of the Zimmer employees involved in providing Johnson's Centralign to his doctor or that any such employee(s) acted improperly. In short, there is not enough evidence before the Court to sustain this theory and summary judgment will be granted accordingly.

## C.    Breach of Warranty

To establish any breach of warranty claim, the plaintiff must prove (1) the existence of a warranty; (2) a breach; and (3) proximate cause (a causal link between the breach, i.e. the defective product, and the alleged harm). *Peterson v. Bendix Home Sys.,*

- 24 -

*Inc.*, 318 N.W.2d 50, 52-53 (Minn. 1982). Mere proof of a warranty and a breach is not sufficient; if the plaintiff fails to prove the element of causation, an otherwise valid action for a breach of warranty will fail. *Inter'l Fin. Servs., Inc. v. Franz*, 534 N.W.2d 261, 266 (Minn. 1995); *Heil v. Standard Chem. Mfg. Co.*, 223 N.W.2d 37, 42 (Minn. 1974). However, circumstantial evidence can be sufficient to show the causal relationship between the product and the subsequent injury. *Inter'l Fin. Servs.*, 534 N.W.2d at 266 (citation omitted); *see also Willmar Cookie Co. v. Pippin Pecan Co.*, 357 N.W.2d 111, 115 (Minn. Ct. App. 1984) (circumstantial evidence sufficient to infer reliance on implied warranty).

Johnson asserts claims for breach of both express and implied warranties. While no particular words are required to constitute an express warranty, *McCormack v. Hankscraft Co.*, 154 N.W.2d 488, 498 (Minn. 1967), Johnson has not provided the Court with any evidence of any representation or statement by Zimmer that might qualify as an express warranty. However, "[a]n implied warranty is imposed by law . . . and does not depend upon the affirmative intention of the parties." *Beck v. Spindler*, 99 N.W.2d 670, 680 (1959). An implied warranty of merchantability requires that goods be "fit for the ordinary purposes for which such goods are used." Minn. Stat. § 336.2-314. "This warranty is breached when the product is defective to a normal buyer making ordinary use of the product." *Peterson*, 318 N.W.2d at 53. The same evidence that supports Johnson's claims of defective design is also sufficient to support a claim of breach of implied warranty.

**D.    Loss of Consortium**

Johnson's wife, Roberta, has also brought a claim for loss of consortium. A claim for loss of consortium is necessarily derivative of an underlying tort claim. *Kohler v. Fletcher*, 442 N.W.2d 169, 173 (Minn. Ct. App. 1989) (citing *Peters v. Bodin*, 65 N.W.2d 917, 922 (Minn. 1954)). Because Johnson's claims for defective design survive, so too does his wife's claim for loss of consortium.

## CONCLUSION

For the reasons discussed above, the Court affirms the order of the Magistrate Judge granting in part and denying in part Zimmer's motion to exclude Johnson's experts Drs. Rose and Zeliger. Dr. Rose and Dr. Zeliger will be allowed to testify according to the limitations set forth in the Magistrate Judge's order of August 21, 2003.

The Court also grants Zimmer's motion for summary judgment with respect to Johnson's claims of negligent and strict liability failure to warn, negligent and strict liability defective manufacturing, negligent and strict liability failure to train, and breach of express warranty. However, the Court denies Zimmer's motion concerning Johnson's claims of negligent and strict liability defective design, breach of implied warranty, and loss of consortium. Johnson, and his wife, may therefore proceed with these remaining claims.

## ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendant's Motion for Summary Judgment [Docket No. 46] is **GRANTED in part** and **DENIED in part** in accordance with the above opinion.

2.     The Magistrate Judge's Order denying defendant's motion to exclude testimony of Dr. Rose and granting in part and denying part defendant's motion to exclude testimony of Dr. Zeliger [Docket No. 55] is **AFFIRMED**.


DATED:     March 31, 2004                         ___s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                  United States District Judge