**Westlaw.**

Not Reported in F.Supp. Page 1
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, D. New Jersey.

Daniel M. GLENN, Plaintiff,
v.
SCOTT PAPER COMPANY, Defendant.

**Civ. A. No. 92-1873.**

Oct. 20, 1993.

Richard C. Cooper, Mark D. Lurie, McCarter & English, Newark, NJ, for plaintiff.

John J. Mulderig, Joseph A. Zechman, Brown & Connery, Westmont, NJ, Steven R. Wall, Marina C. Tsatalis, Morgan, Lewis & Bockius, Philadelphia, PA, for defendant.

WOLIN, District Judge

**\*1** This matter comes before the Court the on the motion of defendant, Scott Paper Company ("Scott"), for summary judgment against plaintiff, Daniel M. Glenn ("Glenn"), pursuant to Rule 56 of the Federal Rules of Civil Procedure. Glenn initially brought a five-count complaint in the Superior Court of New Jersey against Scott and Daniel Schafer ("Schafer"), Vice President in Charge of Sales at Scott Worldwide Foodservice, a division of Scott. On grounds of diversity, Scott and Schafer then removed the action to this Court, pursuant to title 28, sections 1441 and 1446 of the United States Code. The Court subsequently dismissed all claims with prejudice as to Schafer. Scott now brings this summary judgment motion on Glenn's remaining claims.

In reference to Glenn's complaint, only Counts One, Three and Four are relevant to the pending motion. In Count One, Glenn alleges age discrimination in violation of New Jersey's Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 et seq. In Counts Three and Four, Glenn sets forth common law claims of slander. At oral argument on this motion, Count Five, Glenn's common law claim for intentional interference with prospective business relations, was dismissed. Count Two is applicable only against Schafer, who is no longer a defendant in the action.

For the reasons set forth below, Scott's motion for summary judgment will be granted on all counts.

BACKGROUND
A. Glenn's Employment History--The Age Discrimination Claim

Glenn was born on September 24, 1932. In March of 1970, Glenn was employed by the Hoffmaster Company, a manufacturer and seller of tabletop products in the foodservice industry. By June of 1985, Glenn was serving as Hoffmaster's Eastern Regional Sales Representative. At that time, Scott acquired the Hoffmaster Company and formed Hoffmaster--The Food Service Business of Scott Paper. Scott retained the Hoffmaster Company's management team to run the newly formed division, and Glenn continued to work in his regional management position.

Schafer joined the Hoffmaster Company in 1977 and held the Western Regional Sales Manager position at the time of the Scott acquisition. He, too, retained his management position within Scott's Hoffmaster Division.

In October of 1988, Scott acquired two other manufacturing companies in the foodservice industry and reorganized to form a new organization--The Worldwide Foodservice Business ("WFB"). WFB was comprised of two product groups--one making container products, the other making tabletop products, which included Hoffmaster products.

As part of the reorganization, WFB Vice President and Business Leader, Robert Vanderselt ("Vanderselt"), selected a core management team to oversee WFB operations. The new team replaced the management group previously retained from the original Hoffmaster Company. Schafer was named to the new management team under the title of Vice President, Foodservice Sales. Vanderselt had considered Glenn as a candidate for this position.

**\*2** With the formation of WFB, Glenn was appointed Foodservice Regional Sales Manager for the East (the "Sales Position"). He received a salary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

increase and a high grade position. Glenn's responsibilities included selling container and tabletop products and managing container and tabletop sales representatives. Within the WFB hierarchy, Glenn was to report directly to Schafer.

On June 5, 1989, Vanderselt informed Glenn that Schafer was not satisfied with Glenn's performance and, in lieu of termination, offered Glenn the position of Market/Customer Development Manager (the "Development Position"). The job was newly created and designed to develop and lead the implementation of product and customer innovations in key domestic and international markets. On June 6, 1989, Glenn accepted the position at the same annual salary of $81,000 and subsequently received a $2,500 bonus on June 25, 1989. After Glenn's transfer, Daniel Rodenbush--31 years old at that time--took over the Sales Position.

By January of 1990, the extent of growth in Glenn's area forced WFB to create another Development Position--filled by Scott employee John Acton. In March of 1990, Glenn received a $3,000 increase in his annual salary. In July or August of 1990, Sharon Robbins ("Robbins") replaced Vanderselt as WFB Vice President and Business Leader. In December of 1990, Richard Leaman ("Leaman"), President of Scott Worldwide, eliminated Glenn's Development Position and terminated Glenn's employment with Scott.

B. Events Subsequent to Glenn's Termination--The Defamation Claims

Shortly after Glenn's termination, from December 14 through 17, 1990, WFB held a sales meeting in Bryn Mawr, Pennsylvania, at which WFB introduced to its sales force several new products, including the Custom Easy line. After leaving the Bryn Mawr meeting, William Connelly ("Connelly"), WFB National Marketing Manager, could not locate certain Custom Easy marketing materials--a mock order form and brochure--which he had used in his presentation to the WFB sales force. Connelly telephoned Francis McNamee ("McNamee"), WFB National Customer and Marketing Development Manager, and advised him of the missing items. McNamee offered that Acton might have taken the Custom Easy materials to give to Glenn.

During January of 1991, rumors were circulating throughout WFB that Acton had been accused of stealing the Custom Easy materials to give to Glenn. At this time, Schafer became aware of the rumor, as did Glenn by way of Acton. In March of 1991, Joan Vissers-Damie ("Vissers-Damie"), Scott Senior Creative Liaison, located the missing materials in a box in Oshkosh, Wisconsin and subsequently informed Connelly and McNamee of the discovery. In May or June of 1991, John Hull ("Hull"), a former Scott employee, met McNamee in the Pittsburgh airport. McNamee told Hull that Schafer had been telling people that Acton and Glenn stole the Custom Easy materials. Hull and McNamee discussed the matter in subsequent conversations.

**\*3** Between January and June of 1991, Glenn had a number of discussions with David Shapiro ("Shapiro"), Senior Vice President of Sales at the Marcal Paper Company ("Marcal"). These discussions culminated with Shapiro offering Glenn a position at Marcal as Vice President of the Away From Home Products Group at an annual salary of approximately $100,000. Shapiro subsequently decided not to create the new Marcal position and withdrew the offer to Glenn.

In early 1992, Glenn was a candidate for the position of President at the Network Group. Glenn never received an offer. In the middle of 1992, Glenn was a candidate for a job with Dennis Ogden. Glenn never received an offer. In July of 1992, Glenn commenced to work as a broker for Amoco Foam Products Company--presumably his current employment.

DISCUSSION
A. Standard for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, and once the moving party has sustained this burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986); *Williams v. Borough of West Chester,* 891 F.2d 458, 464 (3d Cir.1989).

A genuine issue is not established unless the evidence, viewed in a light most favorable to the nonmoving party, would allow a reasonable jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248- 49, 106 S.Ct. 2505, 2510-11 (1986); *Radich v. Goode,* 886 F.2d 1391, 1395 (3d Cir.1989). If the evidence is merely

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.     Page 3
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249-50, 106 S.Ct. 2510-11; *Radich,* 886 F.2d at 1395. Whether a fact is material is determined by substantive law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *United States v. 225 Cartons,* 871 F.2d 409, 419 (3d Cir.1989).

Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322; *Appelmans v. City of Philadelphia,* 826 F.2d 214, 216 (3d Cir.1987). Rule 56(e) requires the nonmoving party to go beyond the pleadings and, by affidavits, depositions, interrogatory answers and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex,* 477 U.S. at 323-24, 106 S.Ct. at 2553; *Cooley v. Pennsylvania Housing Fin. Agency,* 830 F.2d 469, 474 (3d Cir.1987).

B. Glenn's Age Discrimination Claim

The crux of Glenn's age discrimination claim is certain disputed remarks made by Schafer at a WFB sales meeting in October of 1988. During the course of the meeting, Schafer allegedly stated that Glenn and some other "older, unproductive" Scott employees were to be terminated. In later conversations, Schafer allegedly referred to these older Scott employees as "dinosaurs."

**\*4** Glenn contends that Schafer followed through on his promise. By December of 1988, several other older employees accepted "voluntary retirement" packages. Then in June of 1988, Schafer, motivated by age bias, instigated Glenn's transfer to the Development Position, which was authorized and implemented by Vanderselt. Glenn portrays the transfer to and subsequent elimination of the Development Position as a "two-step" dismissal process unlawfully based on age.

1. Standards Applicable to New Jersey's Law Against Discrimination

Glenn brings his age discrimination claim pursuant to New Jersey's Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1 *et seq.* Age discrimination claims under NJLAD are governed by the same standards and burden of proof structures applicable to the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq. See Retter v. Georgia Gulf Corp.,* 755 F.Supp. 637, 638 (D.N.J.1991), *aff'd,* 975 F.2d 1551 (3d Cir.1992); *Giammario v. Trenton Bd. of Educ.,* 204 N.J.Super. 356, 361 (App.Div.1985), *cert. denied,* 475 U.S. 1141 (1986). *Cf. Erickson v. Marsh & McClennan Co..* 117 N.J. 539, 550 (1990) (applying federal standards to NJLAD sex discrimination claim in employment context).

The plaintiff asserting an age discrimination claim carries the ultimate burden of proving, by a preponderance of evidence, that age was the determinative factor in the adverse employment action. *St. Mary's Honor Ctr. v. Hicks,* No. 92-602, 1993 WL 220265, at *6 (U.S. June 25, 1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1093-94 (1981); *Billet v. CIGNA Corp.,* 940 F.2d 812, 816 (3d Cir.1991); *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1216 (3d Cir.1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449 (1989). The plaintiff may meet this burden by presenting either direct or indirect evidence of unlawful discrimination. *See Healy,* 860 F.2d at 1214.

Direct or "smoking gun" evidence is usually unavailable or difficult to acquire. In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1983), the United States Supreme Court outlined a detailed method for establishing an inference of discrimination in the absence of direct evidence. *See also Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 897 (3d Cir.), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26 (1987). *McDonnell Douglas* implemented a three-step analysis, which is applicable in the summary judgment context and allocates the burden of production as follows: (1) plaintiff must come forth with sufficient evidence to establish a prima facie case of discrimination; (2) if plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant, who must articulate some legitimate, non-discriminatory reason for the employee's rejection; (3) if defendant is able to meet this burden, plaintiff must be given the opportunity to come forth with sufficient evidence to show that the legitimate reasons offered by the defendant should not be believed and that age was the determinative factor for the adverse employment action. *See Hicks,* 1993 WL 220265, at *9; *Burdine,* 450 U.S. at 252-53, 101 S.Ct. at 1093.

**\*5** The Third Circuit has steadfastly applied *McDonnell Douglas* where a plaintiff seeks to prove unlawful discrimination by means of indirect evidence. *See Healy,* 860 F.2d at 1209; *Chipollini,* 814 F.2d at 897. However, the Court is aware of the

Not Reported in F.Supp.
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

Page 4

Supreme Court's recent decision in *Hicks,* which clarified step three in the *McDonnell Douglas* framework. Previously, the plaintiff could meet the burden of proof by establishing that the non-discriminatory reason proffered by the defendant was not credible. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *Anastasio v. Schering Corp.,* 48 Fair Empl.Prac.Cas (BNA) 1651, 1653 (3d Cir.1988). Under *Hicks,* the plaintiff does not necessarily meet the burden by simply producing evidence that defendant's articulated reason is pretextual, but must prove that unlawful discrimination was the determinative factor underlying the adverse employment decision. 1993 WL 220265, at *8 ("It is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination"). *See also EEOC v. MCI Int'l, Inc.,* No. 90-1198, 1993 WL 294486, at *7-8 (D.N.J. Aug. 2, 1993) (applying *Hicks* in summary judgment context). Notwithstanding the Supreme Court's refinement in *Hicks,* the *McDonnell Douglas* framework allows a plaintiff to convince the court of discrimination where no direct evidence is available.

3. Glenn Has Presented No Direct Evidence of Age Discrimination

Direct evidence, when presented to the trier of fact, proves the existence of a particular fact in question without the need for inference or presumption. *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 569 (7th Cir.1989). Glenn alleges that Schafer vowed to "get rid of" the "older, unproductive workers" and, at other times, referred to these older employees as "dinosaurs." Scott argues that these statements fail as direct evidence of discrimination because they are (1) inadmissible hearsay, or alternatively, irrelevant as against Scott, because Schafer played no role in Glenn's termination, (2) too equivocal regarding discriminatory intent and (3) too attenuated from the decision ultimately terminating Glenn.

Glenn argues that the alleged statements are admissible against Scott pursuant to the Federal Rules of Evidence, which provide that a statement is not hearsay when it is offered against a party and is made by that party's "agent or servant concerning a matter within the scope of his agency or employment...." Fed.R.Evid. 801(d)(2)(D).

While Schafer denies making the remarks, Scott contends that such statements are inadmissible hearsay against Scott because Vanderselt and Leaman--not Schafer--were responsible for the employment decisions concerning Glenn in June of 1989 and December of 1990. Scott cites a number of cases to support its argument that an agent's allegedly discriminatory statements are not admissible against the defendant employer where the agent had no authority to dismiss the plaintiff and no involvement in the termination decision. *See, e.g., Staheli Eudy v. BWD Automotive Corp.,* 51 Fair Empl Prac.Cas. (BNA) 724-25 (N.D.Ga.1989); *Hill v. Spiegel, Inc.,* 708 F.2d 233, 237 (6th Cir.1983).

**\*6** The Court finds the instant case distinguishable, as the record indicates that Schafer was involved in the employment decisions. Glenn concedes that Vanderselt and Leaman wielded ultimate authority respecting his employment, but proof exists that Schafer played a role in both decisions. It is undisputed that the disintegration of the Schafer-Glenn relationship was the impetus for Vanderselt's decision to remove Glenn from the Sales Position. *See* Certification of Steven J. Wall ("Wall Certification"), Exhibit 3. *See also* Certification of Mark D. Lurie ("Lurie Certification"), Exhibit B, Schafer Deposition at 169-70, 182-83; Exhibit F, Robbins Deposition at 62. In addition, Schafer provided input on the decision by Leaman and Robbins to ultimately let Glenn go and the severance package he would consequently receive. *See* Lurie Certification, Exhibit F, Robbins Deposition at 32-33. Therefore, the Court concludes that otherwise admissible proof of the alleged statements may be offered against Scott as nonhearsay under Rule 801(d)(2)(D).

The Court's determination on the hearsay question appears also to dispose of Scott's irrelevancy argument, in which Scott contends that "[t]he biases of one who neither makes *nor influences* the challenged personnel decision are not probative in an employment discrimination case." *Medina-Munoz v. R.J. Reynolds Co.,* 896 F.2d 5, 10 (1st Cir.1990) (emphasis supplied). As noted, Glenn has offered evidence suggesting that Schafer did influence the employment decisions affecting Glenn. Therefore, the Court concludes that Schafer's alleged statements would not be inadmissible as irrelevant.

The Court's preliminary determinations on admissibility should not impart that the alleged remarks constitute direct evidence of discrimination. The Third Circuit Court of Appeals has found that direct evidence exists where the employer states that the employee was fired because of a protected characteristic. *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 791 (3d Cir.1985), *cert. denied,* 474 U.S. 1057,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

Page 5

106 S.Ct. 796 (1986). *See also Randle v. LaSalle,* 876 F.2d 563, 569 7th Cir.1989) (" 'direct' evidence must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question"); *Perry v. Prudential-Bache Sec., Inc.,* 738 F.Supp. 843, 851 (D.N.J.1989) (remarks not deemed direct evidence where superior did not state that employee was to be fired "because of his age" and any such conclusion could only be "*inferred* from the description of [employee] as being 'old' "), *aff'd,* 904 F.2d 696 (3d Cir.), *cert. denied,* 498 U.S. 958, 111 S.Ct. 386 (1990).

The Court is sensitive to the Third Circuit's directive that competing inferences as to a statement's meaning should not be weighed on a summary judgment motion. *Siegel v. Alpha Wire Corp.,* 894 F.2d 50 (3d Cir.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588 (1990) (summary judgment improper where trial court should have left to jury competing inferences of remark "old dogs won't hunt"). However, the court in *Siegel* was dealing with the plaintiff's attempt to establish discrimination by indirect, not direct, evidence. Therefore, the Court concludes that Schafer's alleged statements cannot be considered direct evidence of unlawful discrimination, as the context in which they were made was not sufficiently proximate to either Glenn's transfer in 1989 or his ultimate termination in 1990. [FN1]

4. Glenn Has Not Established A Prima Facie Case of Age Discrimination

**\*7** To establish a prima facie case of age discrimination the plaintiff must prove by a preponderance of evidence that he or she was (1) a member of a protected class; (2) qualified for the position; (3) dismissed despite being qualified; and (4) ultimately replaced by a person sufficiently younger to permit an inference of age discrimination. *Healy,* 860 F.2d at 1218.

In view of the record, the Court has serious doubts as to whether Glenn can sufficiently prove certain of the required elements. To be sure, Glenn was a member of a protected class both when he was transferred from the Sales Position and when the Development Position was eliminated. In addition, the record suggests that Glenn was qualified to remain in both the Sales Position and the Development Position. Glenn had received satisfactory performance reviews prior to the transfer and had been given a raise in the Development Position prior to termination. *See* Certification of Glenn In Opposition To Motion For Summary Judgment ("Glenn Certification"), Exhibits 1-7. *See also* Scott Appendix, Exhibit A, Glenn Deposition at Exhibit P-6; Exhibit D, Vanderselt Affidavit at ¶¶ 18-20. Any contention by Scott that Glenn was not qualified merely raises a disputed material fact and precludes summary judgment against Glenn. The Court concludes that Glenn has satisfied the class and qualification elements for a prima facie case.

Glenn's effort to satisfy the other two prima facie elements is hampered by his weakly supported "two-step" dismissal theory. Glenn alleges that Scott accomplished its discriminatory goal by transferring Glenn from the Sales Position to the Development Position, which was created only to be eliminated-- a smokescreen for the unlawful dismissal. The Court must ascertain whether the transfer from the Sales Position or the elimination of the Development Position, separately or taken together, were adverse employment actions taken by Scott. Glenn's dismissal after the Development Position was eliminated clearly constituted adverse action by Scott. Conversely, it is not so clear that the transfer to the Development Position fits into a prima facie case of age discrimination under these facts.

Glenn has adduced no evidence that Scott implemented the transfer as a means for ultimately dismissing Glenn. Glenn's two-step theory rests on three points. First, he cites the voluntary retirement of three older employees occurring contemporaneously to his transfer. Second, he asserts that the lack of documentation regarding the creation and subsequent elimination of the Development Position raises an inference that the job was designed merely as a way station on Glenn's journey toward inevitable termination. Third, Glenn identifies Schafer--his comments, his role in the transfer and his advice respecting Glenn's severance. The Court concludes that Glenn's theory and allegations are not sufficiently supported in fact.

Glenn speculates that his removal and transfer were part and parcel of an overall effort to terminate older employees. The Court notes that "the mere offer of an early retirement program does not support an inference of discrimination...." *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1422 (3d Cir.), *cert. denied,* 502 U.S. 941, 112 S.Ct. 379 (1991). Beyond the fact that other older Scott employees accepted voluntary retirement, Glenn offers no personal knowledge or other admissible evidence regarding the contents and acceptance of the retirement packages. *See* Lurie Certification, Exhibit A, Glenn

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

Page 6

Deposition at 194.

 *8 Glenn's two-step dismissal theory connotes a constructive discharge claim, which lurks within the fact that he had no choice but to accept the Development Position in lieu of termination. When considering a constructive discharge claim, the Third Circuit employs an objective test to determine whether the employer's conduct would have foreseeably resulted in working conditions "so unpleasant or difficult that a reasonable person in the employee's shoes would resign.' " *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1079 (3d Cir.1992) (quoting *Goss v. Exxon Office Sys. Co.,* 747 F.2d 885, 887-88 (3d Cir.1984)).

 Glenn provides no objective facts to support his subjective assertions that the Development Position was a make-work, dead-end job, or that Scott's "take it or be terminated" offer led foreseeably to unbearable working conditions. Glenn accepted the Development Position and held it for approximately nineteen months, notwithstanding his alleged personal reservations. While he no longer managed sales representatives, Glenn thrived in the position and was well compensated. After the transfer, Glenn received a $2,500 bonus and his same $81,000 annual salary, along with a subsequent $3,000 raise. *See* Scott Appendix, Exhibit A, Glenn Deposition at 278, 322-23, Exhibit P-6. During Glenn's tenure, the Development Position flourished to such an extent that Scott was forced to create an additional Development Position, filled by John Acton. *See id.,* Exhibit D, Vanderselt Affidavit at ¶ 20. In contrast to Glenn's subjective portrayal, these facts undercut any allegation that Glenn was constructively discharged by the transfer to the Development Position.

 Ultimately, the timing of and circumstances surrounding Scott's decision to eliminate the Development Position were far too attenuated from the decision to transfer Glenn nineteen months earlier. Glenn's failure to produce evidence impedes his effort to pull together the pieces of a discriminatory plot assignable to Scott by way of Schafer's comments and conduct. Consequently, the Court will not consider the transfer--either alone or in conjunction with Glenn's ultimate termination--in determining whether Glenn was dismissed despite his qualifications. In short, the record unreservedly indicates that Scott did not dismiss Glenn until the Development Position was eliminated.

 As to the fourth element, after Glenn was transferred, Scott placed Daniel Rodenbush, aged 31, in the vacant Sales Position. The Court notes that this fact alone, in certain circumstances, would raise an inference that the employment action was discriminatory. However, having concluded that Glenn's transfer is not pertinent to the discrimination claim, the Court finds no relevancy in the fact that Glenn, despite his qualifications, was replaced in the Sales Position by a person outside the protected class.

 The Court must, however, assess Glenn's claim in view of Scott's elimination of the Development Position and ultimate dismissal of Glenn. The record reveals that Scott came to these decisions under the pressure of budget constraints and financial duress. *See* Lurie Certification, Exhibits E, H. Where an employer dismisses an employee in order to reduce the work force, the employer generally does not retain a position which can be filled by someone outside the protected class. Therefore, Glenn must provide evidence that Scott, during its alleged downsizing, treated persons outside the protected class more favorably. *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 342 (3d Cir.1990); *Massarky v. General Motors Corp.,* 706 F.2d 111, 118 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348 (1983).

 *9 Glenn has failed to produce to the Court such evidence, choosing instead to argue that there were no "similarly situated employees, as Glenn's position was sui generis." Glenn's Memorandum Of Law In Opposition To Scott's Motion For Summary Judgment at 36 n. 22. Content to rest his prima facie case on the unsupported allegation that the Development Position was a smokescreen for unlawful discrimination, Glenn does not even attempt to adduce evidence concerning the scope of Scott's downsizing at the end of 1990, including a breakdown of the employees affected. Conversely, the record indicates that forty to fifty salaried employees were terminated between September and December of 1990, as part of Scott's budget reduction plan. *See* Lurie Certification, Exhibit F, Robbins Deposition at 27-28.

 In view of the record presented, the Court, in sum, concludes that (1) Glenn was not dismissed--constructively or otherwise--when he was transferred to the Development Position, (2) Glenn was terminated by Scott despite his qualifications in December of 1990, and (3) the record is without any evidence that younger employees were treated more favorably than Glenn when he was released, notwithstanding the fact that Rodenbush replaced Glenn in the Sales Position in 1989. Therefore, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1993 WL 431161 (D.N.J.)  
**(Cite as: 1993 WL 431161 (D.N.J.))**

Page 7

Court finds that Glenn has not established a prima facie case of age discrimination under the recognized standards.

The Court acknowledges that, in most discrimination actions, the "prima facie case is easily made out." *Massarky,* 706 F.2d at 118. For the record, the Court notes that many of the foregoing problems that obstruct Glenn's prima facie case would also serve to defeat Glenn's age discrimination claim if the Court was required to carry out to completion the *McDonnell Douglas* and *Hicks* analysis.

Assuming that Glenn could establish a prima facie case, the burden would then shift to Scott to offer admissible evidence that would "allow a trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Chipollini,* 814 F.2d at 898. Scott has articulated legitimate, nondiscriminatory reasons to rebut a prima facie case. Regarding the removal from the Sales Position, Scott cites Glenn's poor work performance and resistance to Schafer's directives and policies. *See* Wall Certification, Exhibit 3. Regarding Glenn's final termination, Scott offers testimony of a number of executives concerning the company's financial problems and the need to make cuts. *See* Scott Appendix, Exhibits E, H.

With Scott meeting Glenn's prima facie case, all presumptions of discrimination would disappear and Glenn would then be required to present evidence sufficient to prove that age discrimination was the determinative factor in Glenn's dismissal. *See Hicks,* 1993 WL 220265, at *6-8. Evidence that Scott's articulated reasons have been provided merely as a pretext for discrimination might--but may not necessarily--be sufficient to withstand Scott's summary judgment motion. *Compare id.* at *6 ("proving the employer's reason is false becomes part of (and often considerably assists) the greater enterprise of proving the real reason was intentional discrimination") *with Chipollini,* 814 F.2d at 898 ("in addition to establishing his prima facie case by indirect proof, a plaintiff can prevail by means of indirect proof that the employer's reasons are pretextual without presenting evidence specifically relating to age").

*10 At this stage--as in the determination of Glenn's prima facie case--the survival of Glenn's age discrimination claim depends upon the extent of proof supporting the two-step dismissal theory. [FN2] While the Court does not suggest that an employer never could utilize a two-step dismissal process to mask a discriminatory motive, the Court concludes that Glenn's allegations cannot not survive summary judgment on the evidence presented here, given the nature and circumstances of Glenn's employment in the Development Position. Even if a discriminatory motive could be assigned to Schafer, the Court can find no evidence in the record raising an inference that Scott (1) actually terminated Glenn--constructively or otherwise--based on Schafer's recommendation or (2) developed and eliminated Glenn's Development Position in order to hide a discriminatory motive for dismissing Glenn.

To withstand Scott's motion for summary judgment, Glenn must produce "more than a mere scintilla of evidence" to support his claims, and cannot simply recycle factually unsupported allegations. *See Williams,* 891 F.2d at 458. [FN3] On the basis of the record presented, the Court will grant Scott's motion for summary judgment on Glenn's age discrimination claim.

C. Glenn's Defamation Claims

As noted, Glenn's defamation claims are based on events that occurred after the elimination of the Development Position and his release from Scott. Glenn asserts that Scott employees, McNamee and Schafer, published statements falsely accusing Acton and Glenn with the theft of the Custom Easy materials, which, in actuality, were inadvertently misplaced after the WFB sales meeting in Bryn Mawr, Pennsylvania, in December of 1990.

Glenn points to the following to support his defamation claims: (1) statements allegedly made by Schafer to a group at a lunch meeting in Oshkosh, Wisconsin, (2) prior to revoking Marcal's job offer to Glenn, Shapiro allegedly informed Glenn that he had heard rumor of Glenn's involvement in the theft of the materials, (3) statements made by McNamee within one month of the sales meeting, suggesting that Acton stole the Custom Easy materials for Glenn, (4) the statement made by McNamee to Hull, a former Scott employee, in the Pittsburgh airport in May or June of 1991, indicating that Schafer was telling people that Acton and Glenn stole the missing Custom Easy materials, and (5) other statements made by McNamee and other Scott employees to Hull regarding Schafer's accusations.

Scott argues that the Court should summarily dismiss Glenn's defamation claims because (1) the record contains no evidence of defamation that would be admissible at trial, (2) the claims are time-barred

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 8
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

by the applicable statute of limitations and (3) any defamatory conduct by Schafer or McNamee is not assignable to Scott as a matter of law. The Court agrees with Scott on all three points.

1. The Record Contains Insufficient Admissible Evidence of Defamation

To withstand a summary judgment motion, the non-moving party must produce evidence that can be reduced to admissible form at trial. *Williams,* 891 F.2d at 466 n. 12. Hearsay problems plague Glenn's effort to adduce evidence that a Scott employee did in fact charge Glenn with the theft of the Custom Easy materials. In almost every circumstance concerning the alleged accusation, Glenn offers testimony of individuals who attribute the accusations to Schafer or McNamee, but never unequivocally state they heard either of these individuals make an accusation. Weeding through the record, the Court is not satisfied that Glenn has produced enough admissible evidence to withstand Scott's summary judgment motion.

 *11 As discussed above, under the Federal Rules of Evidence, a statement is not considered hearsay where it is offered against a party and is directly attributed to that "party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). The offering party must make a threefold showing, through evidence independent of the proffered statement, that (1) an employment relationship existed between the declarant and the party, (2) the statement was made during the agency or employment relationship and (3) the statement concerned a matter within the declarant's scope of employment. *Boren v. Sable,* 887 F.2d 1032, 1038 (10th Cir.1989) (cited with approval in *Lippay v. Christos,* 996 F.2d 1490, 1497 (3d Cir.1993)). [FN4]

Given this evidentiary rule regarding party-opponent admissions, the Court would consider nonhearsay--thus admissible against Scott--any statement respecting the Custom Easy materials made by Schafer or McNamee during their employment relationship with Scott. *See MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1143 (7th Cir.) (documents containing statements attributable to high level management constitute corporate admission under Rule 801(d)2(D) even if report is based on hearsay or reflects opinion), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234 (1983). [FN5]

While the Court concludes that certain of the statements attributed to Schafer or McNamee may be admitted as evidence against Scott, Glenn's evidentiary problems are only beginning. Rule 805 provides that hearsay statements contained within hearsay statements, also known as double hearsay, are not excluded under the hearsay rules if each segment of the combined statement, when considered separately, falls within a hearsay exception. Fed.R.Evid. 805. Although the alleged statements by Schafer and McNamee are technically nonhearsay under Rule 801(d)(2)(D), Rule 805 provides a useful tool for determining whether there exists any evidence of defamation admissible against Scott.

Utilizing the Rule 805 framework, the Court, as noted, would be satisfied that most of the alleged statements by Schafer and McNamee regarding the theft of materials, when considered alone, overcome the first hurdle in the double hearsay analysis. However, Glenn repeatedly attempts to introduce these admissible statements via out-of-court declarations of other unidentified declarants.

Reviewing the record, the Court finds too many phantom sources, which undermine the reliability concerns that pervade the hearsay rules. *See Boren,* 887 F.2d at 1036. Regarding the lunch meeting in Oshkosh, Glenn testified as to "what I had been hearing from several people." Lurie Certification, Exhibit A, Glenn Deposition at 12. In response, Glenn then contacted Acton, [FN6] who investigated the story through his superior at the time, Michael O'Neil ("O'Neil"), who according to Glenn, told Acton that "he did know about the [accusation], *they* had heard Schafer say it ... Mr. O' Neil did know that Mr. Schafer was saying it." *Id.* at 30-31 (emphasis supplied).

 *12 Viewed in a light most favorable to Glenn, this evidentiary offering constitutes Glenn testifying as to what he was told by Acton regarding what Acton was told by O'Neil regarding what Schafer was heard to have said about the missing materials. The record does not reveal that Acton, much less O'Neil, heard the accusation directly from Schafer. Respecting the Oshkosh meeting and the O'Neil conversation, Glenn is unable to direct the Court to any individuals who heard Schafer make the alleged accusation and whose out-of-court declarations are admissible against Scott. [FN7] Where declarants are identified as "they" and "several people," the Court is simply not satisfied that the trustworthiness requirements of Federal Rules of Evidence are met. *See Carden v. Westinghouse Elec. Corp.,* 850 F.2d 996, 1003 (3d Cir.1988) (statements of unidentified declarants inadmissible).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1993 WL 431161 (D.N.J.)  
**(Cite as: 1993 WL 431161 (D.N.J.))**

Page 9

Hearsay problems confound other attempts by Glenn to introduce the alleged accusations. During the investigation into the missing materials, Vissers-Damie, the Scott employee charged with the search, was told by her supervisor, Douglas Schommer that "McNamee had accused Acton of taking [the materials] to give to ... Glenn." Scott Appendix, Exhibit I, Vissers-Damie Deposition at 13. [FN8] The record does not indicate that Vissers-Damie heard the accusation directly from McNamee. In addition, Vissers-Damie was unable to identify the individual who talked to Schommer, and could only offer that Schommer told her that McNamee was the "source" of the theft rumors. Lurie Certification, Exhibit I, Vissers-Damie Deposition at 14, 32. In this instance, Glenn again offers unreliable evidence based on statements not directly attributable to any identified individual.

The Court now turns to Glenn's contention that Shapiro had been advised of the alleged theft and consequently revoked Marcal's offer to Glenn. *Id.,* Exhibit A, Glenn Deposition at 69-70. According to Glenn, Shapiro never identified the individual who informed him of the rumor. *Id.* at 70. In addition to the unidentified declarant problem, Shapiro's statement, as offered through Glenn's testimony, is hearsay and not within any hearsay exception. [FN9] In addition, Shapiro has testified that he did not know of the rumor until he became involved in this litigation. *See* Scott Appendix, Exhibit N, Shapiro Deposition at 39-40.

Finally, the Court reviews Hull's deposition, wherein he testified that (1) McNamee, on at least three occasions, told him about Schafer's accusations and (2) other Scott employees also, at various times, had discussed the rumors with him. In addition to his conversations with McNamee, Hull discussed in separate instances the alleged theft with Scott employees Milt Napper, Penny Amundson, Kathy Hable and Steve Gubelman. *See* Lurie Certification, Exhibit G, Hull Deposition at 59. The Court finds that unidentified declarants also impede the introduction of the statements from Admundson, Napper and Gubelman via Hull's testimony. *Id.* at 76-78, 83-86. As to Hable's statements, Hull was unable to testify regarding the source of her knowledge. *Id.* at 87-88. [FN10]

**\*13** Turning to the Hull-McNamee conversations, Hull testified that McNamee said, "Schafer is going telling everybody that Glenn and Acton stole it and tried to sell it to Wisconsin Tissue Mills." *Id.* at 61. Hull reported a subsequent conversation, wherein McNamee stated that "Schafer says he has proof, and he continues to go around telling people that Glenn and Acton stole it." *Id.* at 70. In addition, Hull asserted that he knew "for a fact" that McNamee heard the accusation directly from Schafer, because McNamee told him so. *Id.* at 76.

The Court concludes that this paltry bit of testimony is the only piece of admissible evidence against Scott concerning Schafer's alleged defamation, despite serious reservations regarding its reliability. There are no unidentified declarants in the chain of reporting which culminates in Hull's testimony. On purely technical grounds, hearsay rules are not violated when Hull testifies that "McNamee said, 'Schafer said, "Acton stole the materials for Glenn." ' "

In segment one of Hull's testimony, Schafer allegedly makes the accusation within McNamee's presence (the "Schafer Statement"). Schafer's out-of-court declaration is nonhearsay under Rule 801(d)(2)(D)--a party-opponent admission by Scott. The Schafer Statement was made during Schafer's employment with Scott and the theft of the materials was a matter within the scope of Schafer's responsibilities as Vice President. In addition, the Schafer Statement is not hearsay because it is not being offered for the truth of its content, but rather, for the fact that the statement was made. *See, e.g., United States v. Cantu,* 876 F.2d 1134, 1137 (5th Cir.1989).

In segment two, McNamee relates Schafer's accusation to Hull on at least three separate occasions (the "McNamee Statements"). Certain of these out-of-court declarations to Hull are also nonhearsay under Rule 801(d)(2)(D). The pertinent question as to the McNamee Statements is not whether engaging in the discussions with Hull was within McNamee's scope of employment. The Federal Rules of Evidence merely require that the alleged theft and accusations be matters within the scope of McNamee's employment. *See, e.g., MCI Telecommunications,* 708 F.2d at 1143. The Custom Easy materials, their disappearance and Schafer's alleged accusations were all matters within the scope of McNamee's employment as WFB National Customer and Marketing Manager and as a subordinate to Schafer. *See* Lurie Certification, Exhibit L, Scott's Objections and Answers To Glenn's First Set of Interrogatories at 23-25; Exhibit B, Schafer Deposition at 61.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
1993 WL 431161 (D.N.J.)  
**(Cite as: 1993 WL 431161 (D.N.J.))**

Page 10

In sum, as to admissible evidence, the Court agrees, in part, with Scott. The record contains second and third-hand accounts of Schafer's alleged accusations. The majority of these accounts --if not hearsay by themselves-- are based on unreliable hearsay statements made by unidentified declarants or, in one instance, rebutted by the declarant himself. However, the Court does find admissible Hull's testimony regarding the McNamee Statements.

*14 The Court comes to this conclusion with certain reservations based on the fact that Schafer's statement to McNamee, as revealed by Hull, lacks clarity of context and content. This only magnifies the reliability problem associated with layering out-of-court declarations on top of other out-of-court declarations. *See Boren,* 887 F.2d at 1037 (noting hearsay rule concerns for the accurate reporting of facts, the court warned that with each additional layer of hearsay, there is a corresponding decrease in reliability). Nonetheless, the Court concludes that Hull's testimony is admissible within the Federal Rules of Evidence.

The Court's inquiry, however, does not end with this evidentiary ruling in favor of Glenn. The tenuous admissibility of Hull's testimony does not foreclose questions concerning the applicable statute of limitations or whether Glenn, as a matter of law, can withstand Scott's summary judgment motion. The Court determines that Glenn fails on both grounds. In reaching this conclusion, the Court focuses narrowly on Hull's testimony alone, given the inadmissibility of the balance of Glenn's profferings.

2. Statute of Limitations and Republication

Moving beyond evidentiary concerns, the Court must, as a preliminary matter, determine from which state it is to draw the substantive law and statute of limitations to be applied to Glenn's defamation claims. Sitting in diversity, this Court generally must look to New Jersey law to guide the choice of law decision. *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020 (1940). However, the Court sua sponte will not challenge the application of a particular state's law where (1) the parties implicitly agree as to the governing law, (2) the state has an interest in the litigation and (3) the state's relevant law does not significantly conflict with the laws of another state with a comparable interest in the case. *See Schiavone Constr. Co. v. Time,* 735 F.2d 94, 96 (3d Cir.1984); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 501-02 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181 (1978).

In the instant case, the parties implicitly agree that New Jersey provides the applicable law. Glenn, the target of the alleged defamation is a resident of New Jersey, and the Court is satisfied that there are no conflicts between New Jersey and Pennsylvania defamation law that will substantially affect the outcome. [FN11] Accordingly, the Court applies New Jersey law to assess Glenn's claims.

New Jersey law provides that defamation actions must be brought within one year "after the publication." N.J.S.A. 2:14-3. New Jersey courts have strictly construed the statute's fixed time period for bringing defamation claims. *See Lawrence v. Bauer Publishing & Printing, Ltd.,* 78 N.J. 371, 374-75 (1979). (citing statute's fixed period, court rejected the "discovery rule" whereby a cause of action in defamation accrues when the plaintiff learns the state of facts which constitute a claim). Therefore, the plaintiff must alleged with specificity the circumstances giving rise to the defamation action. *See Wanamaker v. Columbian Rope Co.,* 713 F.Supp. 533, 544 (N.D.N.Y.1989) (defamation claim time-barred where complaint failed to allege when alleged remarks were made); *Zoneraich v. Overlook Hospital,* 212 N.J.Super. 83, 101 (App.Div.) (claim dismissed where complaint did not allege "when, where, by which defendants and by what words ... plaintiff was defamed"), *cert. denied,* 107 N.J. 32 (1986).

*15 Glenn commenced this suit on March 12, 1992. Therefore, Glenn must allege and consequently adduce evidence that a defamatory remark, assignable to Scott, occurred sometime after March 12, 1991. As Scott contends, the Court finds no record evidence that the Schafer Statement--or any other alleged accusations charged to Schafer-- occurred within the one-year statutory period. Limited to Hull's testimony, Glenn offers little proof as to the timing and specific content and context of the Schafer Statement. Consequently, the Court considers the Hull testimony utterly insufficient to withstand summary judgment with respect to the statute of limitations. [FN12] Failing the statute of limitations as to the Schafer Statement, Glenn argues that the McNamee Statements effected a republication, resurrecting the Schafer Statement and bringing it within the one-year statutory period. Hull testified that the McNamee Statements occurred sometime after April 1, 1991--in May or June of 1991. *See* Lurie Certification, Exhibit G, Hull Deposition at 62-67. The McNamee Statements were made within New Jersey's one-year statutory

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 11
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

period for defamation actions.

Glenn's republication argument raises two related, but separate issues: (1) whether Schafer would be liable as a result any republication by McNamee within the limitations period and (2) whether the McNamee Statements, in and of themselves, are defamatory. Scott contends that the McNamee Statements cannot breathe life into the Schafer Statement, which considered alone would be time-barred. The Court agrees.

"Publication" occurs where the allegedly defamatory statement is communicated to a third person "with a reasonable ground to suppose that it will become known to others." *Kramer v. Monogram Models, Inc.,* 700 F.Supp. 1348, 1351 (D.N.J.1988), *rev'd on other grounds,* 875 F.2d 66 (3d Cir.1989). Under New Jersey law, where a third person has republished a defamatory remark within the limitations period, such republication does not operate to create a new cause of action against the original publisher, where the cause of action respecting the original publication would be time-barred. *See id.* Scott argues that a new cause of action as to Schafer did not accrue when McNamee, the third person, republished the Schafer Statement.

The Court finds *Kramer* instructive. The facts of *Kramer* could be described as follows. Party 1 issues to Party 2 a press release containing alleged defamatory remarks about the plaintiff. Party 2 subsequently publishes excerpts of the press release in a market report and magazine. Plaintiff sues only Party 1 for defamation. The issuance of the press release to Party 2 occurred outside the statute of limitations. The republication by Party 2 occurred within the statute of limitations. The court concluded that the only publication chargeable against Party 1 was the issuance of the press release. Similarly, the Court holds that the only publication chargeable to Schafer would be the Schafer Statement. [FN13]

***16** Determining that Glenn cannot reach Scott through the Schafer Statement is only one piece of the republication puzzle. The McNamee Statements do come within the limitations period. The survival of Glenn's claims rests upon the Court's determination whether the McNamee Statements are, as a matter of law, defamatory. The Court finds against Glenn.

In New Jersey, "one who republishes defamatory matter is generally subject to liability as if he or she had originally published it. *Schiavone,* 735 F.2d at 94. In the republication context, the defense of truth does not mean truthful republication of the original statement, but rather that the original statement does in fact prove to be true. *Lawrence,* 89 N.J. at 461 ("if defendant published that a third person stated that plaintiff has committed a crime, it is no justification that the third party did in fact make that statement").

While these rules of law appear to weigh against Scott, the Court is dissatisfied that McNamee published or republished defamatory matter. In New Jersey, the court, as a threshold matter, decides whether the alleged statement may be construed as defamatory. *Decker v. Princeton Packet,* 116 N.J. 418, 424-25 (1989). The statement "must be taken in context and the publication considered as a whole." *Id.* at 425. *See also Nanavati v. Burdette Tomlin Memorial Hosp.,* 857 F.2d 96, 107 (3d Cir.1988) (context examination covers many factors, including "the nature of discussion in which the allegedly defamatory statements were made" and "the nature of the listener's understanding"), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1528 (1989).

As to the content and context of the Schafer Statement, the Court finds the record so insufficient that making a threshold determination favorable to Glenn is impossible. Through Hull's testimony, the Court gleans little information about what McNamee actually heard Schafer say. While recognizing that false accusations of theft may be defamatory, the Court deems Glenn's only admissible evidence insufficient to support his claims as to Schafer's conduct.

Even if the Schafer Statement is assumed to be defamatory, the Court cannot construe the McNamee Statements as a defamatory republication. Republication questions most often arise where media publishers report stories based on defamatory information received from other persons. Generally, the courts are wary of publishers' attempts to immunize themselves from defamation claims by framing stories as "reports" or "opinions." *See, e.g., Lawrence,* 176 N.J.Super. at 389 ("[s]urrounding the defamatory sting of their words with terms such as 'reportedly,' 'may be,' or 'could possibly be' will not protect a publisher").

The instant case is distinguishable. McNamee did report information to Hull about Schafer's actions, but he did so in a manner and context designed to inform and refute the accusations. When McNamee met with Hull, he knew the Customs Easy materials

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

had been found. *See* Lurie Certification, Exhibit L, Scott's Objections and Answers To Glenn's First Set Of Interrogatories at 24. In addition, Hull's testimony indicates that neither McNamee nor Hull believed the rumors that Glenn attributes to Schafer. *See,* Lurie Certification, Exhibit G, Hull Deposition at 69-70. McNamee did not adopt or republish the Schafer Statement as his own or report it in a manner couched in defamatory "suggestion or insinuation." *Lawrence,* 176 N.J.Super. at 389. Borrowing liberally from the Third Circuit the Court concludes that the "facts indicate that no one who heard the [alleged] slander believed it, and those who repeated the [alleged] slander did so only to express outrage at the speaker.... [The Court believes] New Jersey would not compensate for slander under these facts." *Nanavati,* 857 F.2d at 109.

3. Scott Cannot Be Liable In Defamation Under Principles of *Respondeat Superior*

*17 Finally, even if Glenn could adduce evidence to adequately support his defamation claim, the Court finds that Scott would be entitled to summary judgment based on respondeat superior principles. In New Jersey, an employer may be liable for an employee's torts only if the employee was acting within his or her scope of employment. *GNOC Corp. v. Aboud,* 715 F.Supp. 644, 649 (D.N.J.1989); *Gilborges v. Wallace,* 78 N.J. 342, 351 (1978). To determine scope of employment questions, New Jersey considers whether the conduct (1) is the kind for which the employee was hired to perform, (2) occurs substantially within the job's space and time limits and (3) is undertaken with a purpose to serve the employer. *See Aboud,* 715 F.Supp. at 649 (quoting Restatement (2d) of Agency § 228).

The Court undertakes the scope of employment question by focussing on the only piece of relevant and admissible evidence, the Hull testimony, and determining whether any liability of Schafer and McNamee could be assigned to Scott. The Court's analysis is again constrained by the limited evidence as to Schafer's statements and actions. The evidence leaves too many holes, including to whom, and in what context, Schafer published the accusation. The Court cannot be sure that Schafer, himself, was not merely passing on rumors derived from unidentified declarants or expressing a bona fide opinion. *See* Scott Appendix, Exhibit B, Schafer Deposition at 61-62.

Nonetheless, the Court recognizes that there is evidence that McNamee did hear Schafer say something, somewhere about Glenn and the Custom Easy material. Using its imagination, the Court can envision a discussion between Schafer and McNamee, in which Schafer makes a direct accusation against Glenn under conditions that meet the three-pronged scope of employment standard. Imagination, however, is not the most appropriate juridical tool on motions for summary judgment. Glenn simply provides no evidence that Scott would be liable for Schafer's alleged conduct and comments.

As to McNamee's actions, Hull's testimony does establish context by placing one of their meetings in the Pittsburgh airport. Even assuming that McNamee was on a business trip, and that the subsequent conversation with Hull occurred during business hours, the Court is not satisfied that any evidence suggests that McNamee's conduct should be assignable to Scott. With Glenn providing no evidence to the contrary, the Court is unable to conclude that McNamee's duties encompassed discussions with third parties about the arguably tortious activities of a Scott vice president. In addition, Glenn offers nothing to prove that McNamee was guided by any purpose to serve Scott when making the disclosures to Hull.

CONCLUSION

Glenn's entire case--both the age discrimination and defamation claims --is unable to stand upon the weak evidentiary foundation submitted to withstand Scott's motion. He cannot oppose a valid motion with incompetent or conclusory allegations and thereby continue to pursue his speculative charges. Therefore, the Court will grant Scott's summary judgment motion on all counts.

> FN1. Scott, at length, argues that Schafer's statements, if made at all, were in reference to Glenn's obsolete sales philosophy. Glenn even testified that he understood the remarks in relation to sales philosophy. *See* Appendix to Scott's Statement of Undisputed Facts ("Scott Appendix"), Exhibit A, Glenn Deposition at 169-70. At this juncture, the Court takes no position on the meaning that may be assigned to the alleged remarks, but merely recognizes that an inference must be drawn to tie the statements to the employment actions taken by Scott against Glenn.

> FN2. Glenn asserts that certain statistical evidence supports an inference that Scott

unlawfully discriminated against Glenn. *See Abrams v. Lightolier, Inc.,* 702 F.Supp. 509, 511 (D.N.J.1988) (plaintiff asserting age discrimination claim may "rely on a discriminatory pattern or practice as indirect evidence of discrimination").

Glenn points to two items to support an inference of discrimination: (1) a document produced by Scott which lists certain Scott employees who reported to Schafer on December 31, 1988, June 1, 1989, and/or December 31, 1990, and (2) a Wisconsin agency's finding of probable cause in an administrative complaint of age discrimination filed by a former Scott employee, Donna Wisnoski, who was terminated in early 1992.

Regarding the lists produced by Scott, Glenn offers that, of the employees listed, most are younger than Schafer and those that are older are no longer employed by Scott. *See* Lurie Certification, Exhibit M, Scott's Supplemental Answers To Glenn's First Set Of Interrogatories at Exhibit C; Exhibit B, Schafer Deposition at 201-05. The Court is not persuaded by this "statistical" evidence. First, respecting Glenn's prima facie case, these statistics reveal nothing about the respective ages of those employees affected and those unaffected by the cutbacks instituted by Scott in late 1990--at which time Glenn was terminated. Second, even if the cited statistics support an inference of discrimination to establish a prima facie case, Scott has sufficiently rebutted this inference and may succeed on its summary judgment motion. *See Barnes v. Gencorp Inc.,* 896 F.2d 1457, 1469 (6th Cir.) (employer may rebut prima facie case based on statistics by (1) showing plaintiff's statistical method is faulty, (2) attacking presumption that nondiscriminatory reason for statistical disparity is unlikely or (3) showing that even if bias was a factor somewhere, it did not play a role in the action taken against the specific plaintiff), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211 (1990).

Through its proferred expert analysis, Scott convincingly argues that the statistics become insignificant when reasons for termination are properly factored. *See* Scott Appendix, Exhibit P. *See also Healy,* 860 F.2d at 1217-18 (statistical evidence is relevant to employer's defense and supports summary judgment against employee). In addition, Glenn simply has produced no evidence to counter Scott's work-force-reduction position. *See Barnes,* 896 F.2d at 1469.

As to the Wisnoski complaint, the Court deems the determination by the Wisconsin Department of Industry, Labor and Human Relations irrelevant to Glenn's discrimination claim. Schafer was not Wisnoski's supervisor nor is there any evidence that Leaman was involved in the decision to terminate her. While an administrative determination of probable cause regarding Glenn's claim would be relevant, the Court cannot conclude that the Wisnoski action has any relevance here. *Compare Morehouse v. Boeing Co.,* 501 F.Supp. 390, 392-93 (E.D.Pa.) (in employment discrimination, court deemed inadmissible the testimony of five other former employees with seperate discrimination cases pending against same employer), *aff'd mem.,* 639 F.2d 774 (3d Cir.1980) *with Abrams,* 702 F.Supp. at 512 (preliminary EEOC finding that employer discriminated against plaintiff was admissible in plaintiff's subsequent Title VII action against the employer).

FN3. Presumably frustrated by a lack of evidence to support his claim, Glenn has accused Scott of withholding and destroying relevant evidence. The Court takes a grave view of such charges, which warrant serious sanctions if proven true, or alternatively, if proven false and made in bad faith. The Court is struck by the timing of Glenn's accusation--first brought defending a summary judgment motion after completion of discovery. At no time did Glenn raise these concerns during the discovery phase or bring them to the attention of the magistrate. Glenn never brought a proper motion to compel, or a motion for sanctions, pursuant to Rule 37 of the Federal Rules of Civil Procedure. Therefore, the Court finds it too late in the day for Glenn to raise these discovery issues and does not consider them on the pending motion. *See DesRosiers v. Moran,* 949 F.2d 15, 22 n. 8 (1st Cir.1991) (discovery violations waived where untimely made); *Clinchfield R. Co. v. Lynch,* 700 F.2d 126, 132, 132 n. 10 (4th Cir.1983) (where party objects to discovery,

Case 3:00-cv-01306-JCH   Document 266-13   Filed 01/07/2005   Page 14 of 15

Not Reported in F.Supp.                                                                                   Page 14
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

party seeking discovery must take initiative to request compulsory order).

FN4. Federal common law--not the forum state's law--governs a federal court's interpretation of "agency" under Rule 801(d)(2)(D). *Lippay,* 996 F.2d at 1497.

FN5. The record indicates that at some point after McNamee left Scott, he made additional statements to Hull respecting the Custom Easy materials. *See* Lurie Certification, Exhibit G, Hull Deposition at 61. Because these statements were made when no employment relationship existed between Scott and McNamee, they would not be admissible against Scott. *See Boren,* 887 F.2d at 1038.

FN6. The Court concludes that Glenn had this conversation with Acton, notwithstanding the fact that a portion of Glenn's deposition transcript refers to this individual as John "Abington." *See* Exhibit A, Lurie Certification, Exhibit A, Glenn Deposition at 29. The Court notes that a portion of the Glenn Deposition was revised by hand, changing "Abington" to "Acton." *See,* Scott Appendix, Exhibit A, Glenn Deposition at 51-52.

FN7. Glenn also alleges that two other Scott employees informed him of alleged accusations at the Oshkosh meeting: Barbara Kontos, a secretary at Scott, and Barbara Waite, a Scott customer service representative. *See* Scott Appendix, at 46-49. Kontos did not attend the meeting and her statements are inadmissible because they are based on the statements of an unidentified declarant. *Id.* at 46 ("several people ... had told her"). Kontos' declaration is also hearsay as against Scott--it is not a Rule 801(d) party-opponent admission, as the theft of the Custom Easy materials was not with the scope of her employment.
According to Glenn, Waite did attend the Oshkosh meeting and consequently acquired first-hand knowledge of Schafer's accusation. While the source of Waite's knowledge is not attributed to an unidentified declarant, the Court concludes that her statements to Glenn regarding the accusations are also hearsay as against Scott. While both Kontos and Waite may have learned of the alleged theft during the course of their employment with Scott, the theft of the Custom Easy materials was not a matter within the scope of their employment.

FN8. Scott has admitted that, as the search for the missing materials ensued, McNamee did "opine that perhaps" Acton had stolen them. *See* Scott Appendix, Exhibit J, Scott's Second Set of Supplemental Answers To Glenn's First Set of Interrogatories at 6-7. The Court addresses the consequences of the admission in the discussion below regarding the applicable statute of limitations. *See infra,* at note 10.

FN9. Shapiro, in effect, reports, "I was told of the theft by a Scott employee." Glenn offers Shapiro's statement for its truth--what Shapiro was told. This is hearsay as it is not a statement from a Scott employee or agent under Rule 801(d)(2)(D).

FN10. Acton also testified that Hable informed him of the rumor regarding the alleged theft. *See* Scott Appendix, Exhibit G, Acton Deposition at 45; Exhibit S, Hable Affidavit at ¶ 3. Hable asserts that she never heard the accusation directly from Schafer or McNamee. *Id.,* Exhibit S, Hable Affidavit at ¶ 4.

FN11. The Court acknowledges that Pennsylvania may have a significant interest in having its defamation law applied in the instant case. Defendant Scott is a Pennsylvania corporation. In addition, certain of the McNamee Statements occurred in Pennsylvania at the Pittsburgh airport. However, the Court finds there to be little conflict between Pennsylvania and New Jersey law regarding the statute of limitations and issues of republication.

FN12. The Court also concludes that Glenn's defamation action is time-barred to the extent it is based on Scott's admission that McNamee initially suggested that Acton stole the material. *See* Lurie Certification, Exhibit L, Scott's Objections And Answers To Glenn's First Set Of Interrogatories at 23-24. Eschewing any discussion of whether McNamee's statement could constitute legal defamation, the Court simply notes that McNamee made this statement within a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:00-cv-01306-JCH    Document 266-13    Filed 01/07/2005    Page 15 of 15

Not Reported in F.Supp.                                                                                      Page 15
1993 WL 431161 (D.N.J.)
**(Cite as: 1993 WL 431161 (D.N.J.))**

month of the December, 1990, Bryn Mawr meeting, and prior to March 12, 1991.

FN13. The Court notes that the court in *Kramer* based its conclusions on the fact that there was "no special relationship" between Party 1 and Party 2. *Kramer,* 700 F.Supp. at 1351. Had there been an agency relationship between Party 1 and Party 2, the court would have held that an action could have been brought against either Party 1 or Party 2 within one year of publication because as between principal and agent there is no publication. *Id.* There is no third person.

In reflecting on the instant case, the Court finds these conclusions of some interest. First, Scott assumes McNamee is a third person to whom the Schafer Statement is published. However, within the WFB hierarchy, McNamee was subordinate and reported to Schafer. *See* Scott Appendix, Exhibit B, Schafer Deposition at 61-62. Given the agency relationship between Schafer and McNamee, and the subject matter of the Schafer Statement, *Kramer* would suggest that the Schafer Statement did not constitute a publication, but that Glenn could bring his claims against either Schafer or McNamee based on McNamee's publication within the statute of limitations. *See Kramer,* 700 F.Supp. at 1351 (given the agency relationship, plaintiff may sue the author or the mass media publisher within one year of publication).

The Court finds this portion of *Kramer* unhelpful to the instant case. First, *Kramer's* discourse on agency concerned the application of the single publication rule, which is generally utilized in cases with mass produced materials. The rule provides that a plaintiff will have only one cause of action against a media publisher, accruing on the date the publication was first circulated to the public. *Kramer,* 700 F.Supp at 1351. The single publication rule is simply inapplicable to the facts underlying Glenn's defamation claims--the statements by Schafer and McNamee must be considered separately.

Consequently, the Court treads carefully around the *Kramer* court's focus on the agency relationship between an author and the mass media publisher. The instant case does not involve a mass media publisher, but concerns the agency and employment relationship between a superior and a subordinate. The Court hesitates to conclude that the Schafer Statement, made to McNamee, did not constitute a publication. Defamation may occur during a principal-agent communication, even where such communications have a qualified privilege. *See generally Coleman v. Newark Morning Ledger Co.,* 29 N.J. 357, 375 (1959) (a *bona fide* communication on any subject matter between parties with a common interest or duty respecting the matter is privileged even if it contains actionable defamatory content); *Sokolay v. Edlin,* 65 N.J.Super. 112, 125-28 (App.Div.1961) (common interest to sustain privilege where employees were informed that co-worker stole from employer).

1993 WL 431161 (D.N.J.)

**Motions, Pleadings and Filings (Back to top)**

• 2:92CV01873 (Docket) (May. 04, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.