UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DOLORES DUNN, et. al., | : | |
| | : | MASTER DOCKET NO. |
| Plaintiffs | : | 3:00cv1306 (JCH) |
| | : | [Pertains only to |
| v. | : | 3:00cv1306(JCH), 3:01cv516(JCH), |
| | : | 3:01cv517(JCH), 3:01cv518(JCH), |
| ZIMMER, INC., | : | 3:00cv2270(JCH)] |
| | : | |
| Defendant. | : | JUNE 17, 2005 |

**DEFENDANT ZIMMER, INC.'S MEMORANDUM
IN OPPOSITION TO MOTION TO CONSOLIDATE**

Defendant, Zimmer, Inc. ("Zimmer"), by its attorneys, respectfully submits this memorandum opposing Plaintiffs' motion seeking consolidation of these matters for trial. This Court should deny the motion because: (a) these cases involve predominately individual issues of fact and law; (b) consolidation would necessitate the improper admission of evidence of dissimilar incidents into each case; and (c) consolidation will prejudice Zimmer's right to a fair and impartial trial.

**I.
INTRODUCTION**

Cases pending in the same court may be consolidated if they involve "common question[s] of law or fact." Fed. R. Civ. P. 42(a). The burden is on the party seeking consolidation to show common issues of law or fact; the burden is not on the party opposing consolidation to show divergence. *In re Repetitive Stress Injury Litig.,* 11 F.3d 368, 374 (2d Cir. 1993). Plaintiffs have not satisfied their burden.

Indeed, the only common elements put forth by Plaintiffs are superficial at best and do not get to the heart of whether common questions of law or fact justify consolidation. It is true

that Plaintiffs all present the claim that the Centralign is defective and unreasonably dangerous with regard to its design and warnings; that all of these cases are pending before this Court; that Zimmer is the defendant (which is redundant of the first point); and that certain efficiencies will result from trying these cases at the same time. In this as in the vast majority of other medical device product liability cases, however, such superficial elements do not hold sway because individual case-specific issues of law and fact predominate over those common elements.

Central to whether Zimmer is liable for the injury claimed by each of the Plaintiffs – the revision surgery – is causation. So too is whether Zimmer acted with reasonable care in designing the Centralign. Both of these questions squarely implicate and involve individual issues. The individual issues raised by causation are obvious: surgical technique and patient factors profoundly impact the longevity and fate of the total hip arthroplasty construct. But the question about whether Zimmer acted with reasonable care raises individual issues as well. Plaintiffs' experts' defect theories focus on the shape and size of the stem and the precoating applied to the stem (which presents a consolidation challenge in and of itself – two of the five Plaintiffs had Centralign Option stems which, among other differences from the Centralign stem, are not precoated). In a case like this, one where it is beyond dispute that the product has performed well for many patients, the question whether the stem was "unreasonably dangerous" must be determined on a patient by patient basis.

Further, and in all candor, Plaintiffs' motion for consolidation is nothing more than their latest attempt to transform highly individualized and fact-specific cases into an unworkable class action. This Court refused to grant class certification to the Dunn Plaintiffs. As this Court correctly noted, "central to each of these cases is an inquiry as to exactly what caused the injury at issue. … [T]he answer to that question necessarily involves a highly fact-specific

individualized inquiry." (March 27, 2002 Mem. Op. & Order at 5 (Squatrito, J.).) The Dunn Plaintiffs also sought unsuccessfully to join the other Plaintiffs in order to create an informal class action. Plaintiffs nevertheless seek now to create a backdoor class action under the guise of Rule 42(a) consolidation. The same considerations that led the Court to deny their earlier attempts to combine these cases apply with equal force to prohibit consolidation now.

In addition, Zimmer's right to a fair and impartial proceeding is a paramount concern. It is well-settled that evidence of other dissimilar incidents is not admissible, and consolidating the cases necessarily and improperly permits evidence of that character to reach and sway the jury. In addition, consolidating these separate actions into one would unfairly prejudice Zimmer because the jury likely will focus on the one supposed "common" factor, the stem, and not the important individual factors. Precedent and prudence dictate that these cases should not be consolidated for trial.

## II.
## PROCEDURAL BACKGROUND

### A.    The *Dunn* Complaint and Class Certification

On July 14, 2000, the Dunns filed a Class Action Complaint against Zimmer. The Complaint alleged two causes of action: (1) a claim under Connecticut Products Liability Act, Connecticut General Statutes, Section 52-572m, *et seq.*, and (2) a claim under Connecticut Unfair Trade Practices Act, Connecticut General Statutes, Section 42-100b, *et seq.*

The Dunns alleged that Zimmer products such as the "Centralign Precoat," "Centralign Precoat 1" and "Centralign Precoat 2" were manufactured using the "Precoat" system, which was defective and unreasonably dangerous, and "caused the widespread failure of these products, causing great injury to the users thereof, the repair of which required extensive surgery, often

with poor final results, severe permanent injuries, great pain, discomfort and disability and attendant losses." (Compl. ¶ 3.) The essence of the Complaint filed by the Dunns, therefore, is that precoating is a product defect, which caused the Centralign to debond or loosen prematurely.

The Dunns filed a motion for class certification on September 7, 2000. Zimmer opposed the class motion. At a February 28, 2001 status conference before then-presiding Judge Squatrito, the Court denied the Dunns' motion for class certification as premature. The Dunns again moved for class certification in July 2001. This time Judge Squatrito denied the motion on its merits. Fatal to class certification was the Dunns' failure to establish commonality among the Plaintiffs' claims:

> [T]he liability question in each of the individual cases is not whether the defendant's product was defective. Rather, central to each of these cases is an inquiry as to exactly what caused the injury at issue. In a case such as this, the answer to that question necessarily involves a highly fact-specific individualized inquiry. Therefore, the commonality requirement is not met.

March 27, 2002 Mem. Op. & Order at 5.

**B.**    **Prior Attempts to Join and Consolidate**

During the class certification proceedings, the Dunns also tried to join and consolidate these cases to achieve *de facto* class status. First, the Dunns filed a motion for leave to amend to "cite in" additional plaintiffs. That motion for leave sought to join John and Cynthia Vino. The Dunns later filed additional motions for leave to amend to "cite in" Joann Lopes and Sonia Fuentes-Weed. When denying those motions, Judge Squatrito recognized that the motions to "cite in" additional plaintiffs to the *Dunn* case, were they granted, would be tantamount to *de facto* class treatment and remarked that the motion could be construed as a backdoor attempt to seek class status.

The Dunns then sought to consolidate their case with the *Vino*, *Fuentes-Weed* and *Lopes* cases. On August 15, 2001, Judge Squatrito denied without prejudice Plaintiffs' request to consolidate these cases for trial because any decision on that issue would have been premature. The Court consolidated *Dunn*, *Vino*, *Fuentes-Weed*, and *Lopes* for purposes of discovery only. When Mr. Johannsen later filed suit, *Johannsen* was also consolidated with the *Dunn* litigation for discovery purposes.

**C.    Current Procedural Posture**

Plaintiffs have now renewed their efforts to consolidate these cases for trial. While some have loss of consortium claims and others do not, the relevant claims remaining are the same for all of the Plaintiffs – the Centralign is defective and unreasonably dangerous with regard to its design and warnings. Dunn, Vino and Lopes allege these claims with regard to the Centralign with precoating. Fuentes-Weed and Johannsen allege the same claims with regard to the Centralign Option which differs from the Centralign because it has no precoating or built-in centralizers.

**III.**
**FACTUAL BACKGROUND**

The following discussion highlights how the evidence related to each of the Plaintiffs is uncommon. First, however, we will discuss total hip arthroplasty generally, the multifactorial nature of loosening, and the two most important sets of factors which play a role in loosening – surgical and patient factors.

**A.    Total Hip Arthroplasty**

Total hip arthroplasty involves substituting metal and polyethylene implants for the surfaces of bone making up the total joint. (Affidavit of Richard Berger, M.D. ("Berger Aff."),

Appendix ("App.") A, ¶ 5.) The femoral component, which consists of a stem implanted into the patient's femur and a femoral head (a sphere that serves as the ball), replaces the patient's femoral head. (*Id.*) The patient's hip socket is replaced by a metal shell implanted into the patient's hip into which is placed a liner; together these components are known as the acetabular component. (*Id.*) When bone cement is placed in the patient's medullary canal prior to inserting the femoral stem, the stem is described as a cemented femoral component. The Centralign and Centralign Option are both cemented femoral components.

Many factors contribute to the longevity, and conversely can cause the loosening, of a total hip arthroplasty and the Centralign is no exception to this fundamental rule. (*Id.*, ¶ 34; *see also* S.D. Jarrett and P.F. Lachiewicz, "Precoated Femoral Component with Proximal and Distal Centralizers, Results at 5 to 12 Years," The Journal of Arthroplasty, Vol. 20, No. 3 (April 2005), and Abstract: R.E. White, T.A. Gruen, B.H. Dales, J.A. Trauger, J.K. Allman, "Early Results of Hybrid Total Hip Replacement Using the Centralign Femoral Component at Two to Six Years" attached at App. B and C.) An individual failure of a hip must be judged as that, an individual failure, based upon the unique variables associated with that particular patient and that particular failure. (*Id.*) Set forth below is a discussion of the most important of those variables for understanding the failures at issue in these cases, surgical technique (Part 1) and patient factors (Part 2).

### 1. The Importance And Variability Of Surgical Technique

The most significant factor in the longevity of cemented stems is the surgical technique used in implanting the stem. (Berger Aff., App. A, ¶ 8.) The numerous variables that are involved in implanting the stem generally can be described as "operative technique." (*Id.*) Before cementing the stem the surgeon encounters and considers some of these variables, which

include the approach to the hip and the restoration of anatomic function. (*Id.*, ¶¶ 9, 10.)  For purposes of understanding why each Plaintiff's stem loosened in the manner and in the time period it did, however, the cementing technique and the resulting mantle are the most important variables. (*Id.*, ¶ 8.)

Among the variables influencing the quality of the cement mantle and the overall longevity and usefulness of the total hip construct are the canal preparation; the quality of the patient's normal cancellous bone structure; the interdigitation of the inserted bone cement with the remaining bone, which depends in part on how well the surgeon prepared the canal including whether blood interrupted the interface between the bone cement and the bone; the method by which the surgeon and the operating staff mixed the bone cement; the point in time the cement is added to the canal; the temperature and humidity level in the operating room; and the placement of the stem within the cement mantle. (*Id.*, ¶¶ 3, 13-16, 18-19, 22, 24-28.)

### 2.    <u>The Role Of Patient Factors In Loosening</u>

A number of patient factors as well dictate how long the stem will last. (Berger Aff., App. A, ¶ 6.)  The patient's height, weight and activity are the three most important variables. (*Id.*, ¶ 32.)  The longevity of two hips that may have been implanted with identical surgical technique (but as shown above we know that to be impossible), using identical stem designs, would then be based upon how much the hip is used and for what type of activities. (*Id.*, ¶ 33.)  For example, climbing stairs puts seven times more force on a hip than walking.  (*Id.*)  Therefore, a patient living in a house with many stairs would be expected to have his or her hip wear out faster than a patient living in a ranch house or living in an apartment with an elevator. (*Id.*)  Additionally, the amount of impact loading has significant effect upon the hip.  (*Id.*)

Whether or not the patient exercises, and whether or not the exercise involves impact, significantly affects a total hip's longevity. (*Id.*)

**B.**     **Surgical And Patient Factors Differentiating These Plaintiffs**

    **1.**     **Dolores Dunn**

On October 16, 1996, Dr. Grady-Benson examined Mrs. Dunn and determined by her x-rays that she had significant degenerative arthrosis (joint disease) and recommended that she have her left hip replaced. (Deposition of Dolores Dunn, dated June 21, 2001 ("Dunn Dep."), App. D, p. 92 l. 20 - p. 93 l. 4; Deposition of John Grady-Benson, M.D., Volume II, dated April 26, 2002 ("Grady-Benson Dep. Vol. II"), App. E, p. 217 ll. 7-20.) On December 3, 1996, Dr. Grady-Benson performed the total hip replacement on Mrs. Dunn's left hip using a size 2 Centralign precoated femoral stem and fixed it with bone cement into which he added powdered antibiotics. (Berger Aff., App. A, ¶¶ 42-43; Grady-Benson Dep. Vol. II, App. E, p. 233 l. 15 – p. 236 l. 13; Deposition of John Grady-Benson, M.D. Volume I, dated November 30, 2001 ("Grady-Benson Dep. Vol. I"), App. F, p. 107 ll. 2-23.) Dr. Grady-Benson utilized a modified posterior Coker Gibson approach for the procedure. (Grady-Benson Dep. Vol. II, App. E, p. 226 l. 18 – p. 227 l. 1.) At the time of the surgery, Mrs. Dunn was 63 years old, 5'7" and weighed 180 lbs. (Berger Aff., App. A, ¶ 42.)

Mrs. Dunn did well intra-operatively and had no significant post-operative complications. (Berger Aff., App. A, ¶ 44.) She was seen by Dr. Grady-Benson approximately 15 days later and an x-ray was obtained. (*Id.*) This oblique x-ray clearly shows that there is an area without cement adjacent to the prosthesis in the trochanteric zone. (*Id.*) In that area there is a radiolucent line which extends next to the cement proximally and distally. (*Id.*) Zimmer's expert, Dr.

Richard Berger, has noted and is prepared to testify that this area represents an intra-operative defect (lack of bonding) in the cement mantle and confirms an incomplete cement mantle. (*Id.*)

Mrs. Dunn did well following her left hip replacement, and until mid-1998 she was walking well and experiencing no pain. (Dunn Dep., App. D, p. 8 l. 1 – p. 11 l. 5.) Her activities included walking, biking, swimming and housework. (*Id.,* p. 8 l. 25 – p. 9 l. 16; p. 11 l. 16 – p. 18 l. 23.) On July 10, 1998, she returned to Dr. Grady-Benson for follow-up. (Grady-Benson Dep. Vol. II, App. E, p. 247 ll. 10-12; Dunn Dep., App. D, p. 11 ll. 8-9.) She reported increasing pain over the previous several months and described a "grinding" sensation in her hip. (Grady-Benson Dep. Vol. II, App. E, p. 247 ll. 13-17; Dunn Dep., App. D, p. 11 ll. 4-7.) X-rays taken during that visit showed what Dr. Grady-Benson believed to be 0.5 mm of debonding in the proximal lateral and anterior portion of the stem. (Grady-Benson Dep. Vol. II, App. E, p. 247 l. 23 – p. 248 l. 22.) On June 21, 1999, Mrs. Dunn underwent a revision left total hip arthroplasty, again performed by Dr. Grady-Benson. (*Id.,* p. 268 ll. 12-13.) Mrs. Dunn did well post-operatively. (Berger Aff., App. A, ¶ 45.)

Zimmer's experts will testify that Mrs. Dunn's stem loosened due to three contributing factors that caused the failure of the cement around her prosthesis. First, because of the absence of cement in Zone 1, an area that has been shown to be one of the most important areas in rotationally stabilizing the prosthesis, the cement mantle was inadequate to hold the prosthesis. (*Id.,* ¶ 46.) The non-continuous cement mantle in this area imparted significant strain in the remaining cement and negatively impacted the stem's ability to resist torsional forces. (*Id.*) Furthermore, the cement was further weakened by adding an antibiotic to the cement. (*Id.*) It has been shown in biomechanical studies, as well as clinical research, that adding antibiotics to

cement weakens the cement mantle. (*Id.*) Inadequate cementing, exasperated by weakening of the cement with an antiobiotic additive, was the proximate cause for Mrs. Dunn's failure. (*Id.*) The third and final contributing factor to Mrs. Dunn's cement failure was her small canal. (*Id.*, ¶ 47.) Her small canal, in Dr. Grady-Benson's surgical judgment, necessitated a small stem in a relatively large woman of 180 lbs. (*Id.*) This small stem further contributed to the increased strain in the cement. (*Id.*) The small stem, having a relatively small surface area, was imparting larger forces to the surrounding cement, particularly in light of the weakened state of the cement from the additive, as well as the incomplete cement mantle. (*Id.*)

### 2. <u>John Vino</u>

During their first appointment, Dr. Grady-Benson discussed the difference between cemented and cementless implants with Mr. Vino. (Deposition of John Vino, dated October 25, 2001 ("Vino Dep."), App. G, p. 44 l. 22 – p. 45 l. 12; Grady-Benson Dep. Vol. I, App. F, p. 75 l. 24 – p. 76 l. 20.) Mr. Vino chose to have a cemented implant because the rehabilitation period would be much shorter. (*Id.*) On September 4, 1996, Dr. Grady-Benson implanted a size 2 Centralign precoated femoral stem in Mr. Vino's femur with bone cement into which he added antibiotic powder. (Berger Aff., App. A, ¶¶ 59-60; Grady-Benson Dep. Vol. II, App. E, p. 233 l. 15 – p. 236 l. 13; Grady-Benson Dep. Vol. I, App. F, p. 107 ll. 2-23.) Dr. Grady-Benson had pre-operatively selected for Mr. Vino a size 3 Centralign. (*Id.*, p. 97 ll. 15-17; Grady-Benson Dep. Vol. II, App. E, p. 220 ll. 17-20; p. 221 ll. 5-23; Berger Aff., App. A, ¶ 60.) During surgery, however, Dr. Grady-Benson decided that he would risk removing too much bone if he created a cavity sufficiently large for a size 3, so he elected to use a smaller size 2 instead. (Grady-Benson Dep. Vol. I, App. F, p. 102 ll. 8-16.) Because he was concerned about dislocation due to Mr. Vino's high level of activity, Dr. Grady-Benson used an anterolateral

approach, which tends to have a lower dislocation rate, rather than a posterior approach. (Berger Aff., App. A, ¶ 59; Grady-Benson Dep. Vol. I, App. F, p. 93 l. 19 – p. 94 l. 6.) At the time of surgery, Mr. Vino was 54 years old, 5'10" and weighed 190 lbs. (Berger Aff., App. A, ¶ 59.)

Mr. Vino did well intra-operatively and had no significant post-operative complications. (Berger Aff., App. A, ¶ 60.) On post-operative x-rays taken within the first year after surgery, however, there is an area of incomplete cement mantle in the proximal Zone 1 on the AP or Zone 8 on the lateral. (*Id.*) Mr. Vino initially did quite well until subsequent x-rays showed lysis starting in the area of incomplete cement mantle. (*Id.*) This is best evident on the March 13, 1998 oblique x-ray, which shows that the area in Zone 1 on the AP (or Zone 8 on the lateral) started developing osteolysis in the area where no cement was initially placed. (*Id.*) Zimmer's expert, Dr. Richard Berger, has noted and is prepared to testify that this incomplete cement mantle allowed particulate debris from the joint (polyethylene), as well as small fragmentation of the cement due to the incomplete cement mantle, to get direct access to the bone. (*Id.*) The bone then reacted to the small particulate matter and started to dissolve, causing what we call osteolysis. (*Id.*)

Mr. Vino did well following his right hip replacement, and until mid-1997 he was walking well and experiencing no pain. (Vino Dep., App. G, p. 58 l. 5 – p. 59 l. 22.) In fact, during this time, he had returned to his very active lifestyle: working a full schedule, including traveling 3-4 days a week; a vigorous aerobic exercise program, including walking, outdoors and on a treadmill, floor exercises, weight training with dumbbells and biking on a stationary bike; mowing the lawn; gardening and yard maintenance. (*Id.*, p. 60 ll. 1-17; p. 61 ll. 6-24; p. 62 ll. 20-23; p. 63 ll. 2-22; p. 64 l. 2 – p. 65 l. 11; p. 69 ll. 9-25.) On December 5, 1996 (three months after the surgery), Dr. Grady-Benson examined Mr. Vino and noted that Mr. Vino was engaged

in a "very active lifestyle" including "a relatively vigorous aerobic exercise program." (Grady-Benson Dep. Vol. I, App. F, p. 131 ll. 8-18.)  Dr. Grady-Benson discussed with Mr. Vino the appropriate activities after hip replacement and expressed concern about Mr. Vino's extremely active lifestyle because a high activity level can result in problems with implant fixation. (*Id.,* p. 132 ll. 1-9.)

On March 25, 1997, Dr. Grady-Benson again discussed with Mr. Vino the appropriate care of an implant because Mr. Vino continued to be "very physically active." (*Id.*, p. 132 l. 20 – p. 133 l. 21.)  Mr. Vino returned to Dr. Grady-Benson for follow-up on August 1, 1997.  (Vino Dep., App. G, p. 73 ll. 2-15; Grady-Benson Dep. Vol. I, App. F, p. 134 l. 21 – p. 135 l. 7.)  He reported experiencing an ache, or a "pinch" in his groin which he had felt for the first time while gardening on his hands and knees.  (Vino Dep., App. G, p. 73 l. 15 – p. 75 l. 10; Grady-Benson Dep. Vol. I, App. F, p. 135 ll. 2-15.)  Mr. Vino continued to experience discomfort and returned to Dr. Grady-Benson in September of 1997.  (Vino Dep., App. G, p. 78 ll.7-25.)  Dr. Grady-Benson noted that "Mrs. Vino reports that she feels her husband has been performing over vigorous activities on the hip." (*Id.,* p. 84 ll. 18-23; Grady-Benson Dep. Vol. I, App. F, p. 144 l. 21 – p. 145 l. 2.)  X-rays showed osteolysis, or bone deterioration, starting in the area where no cement initially had been placed.   (Berger Aff., App. A, ¶ 37.)   Dr. Grady-Benson "recommended that [Mr. Vino] decrease his impact loading activities significantly." (Affidavit of Albert Burstein, Ph.D. ("Burstein Aff."), App. H, ¶ 58.)  On April 21, 1998, Mr. Vino underwent a revision right total hip arthroplasty.  Mr. Vino did well post-operatively.  (Grady-Benson Dep. Vol. II, App. E, p. 202 ll. 19-23.)

Zimmer's experts will testify that Mr. Vino's stem loosened due to three contributing factors that caused the failure of the cement around his prosthesis.  Mr. Vino's cement mantle

failed predominantly because he had an incomplete cement mantle which predisposed the cement mantle to failure. (Berger Aff., App. A, ¶ 61.) The cement was further weakened by an antibiotic additive which has been shown both clinically and biomechanically to weaken the cement mantle. (*Id.*) In addition to the above two factors, Mr. Vino being a large and active male imparted a great deal of stress to his prosthesis. (*Id.,* ¶ 62.)

### 3. Sonia Fuentes-Weed

Dr. Courtland Lewis examined Ms. Fuentes-Weed on July 17, 1996 after she began to experience progressive discomfort in her right hip. (Deposition of Courtland Lewis, M.D., dated June 28, 2002 ("Lewis Dep."), App. I, p. 20 l. 3 – p. 21 l. 17.) Ms. Fuentes-Weed has been suffering from rheumatoid arthritis since 1985. (Burstein Aff., App. H, ¶ 60.) Because of this disease, she has a long history of treatment with anti-inflammatory medication including steroids. (*Id.*) Due to the severity of her condition, Dr. Lewis determined that Ms. Fuentes-Weed would be a reasonable candidate for hip arthroplasty, "understanding her youth is a relative contraindication." (*Id.,* p. 22 l. 8 – p. 23 l. 21; Deposition of Sonia Fuentes-Weed, dated October 24, 2001 ("Fuentes-Weed Dep."), App. J, p. 51 l. 8 – p. 52 l. 7.) On November 7, 1996, Dr. Lewis implanted a size 2 Centralign Option femoral stem in Ms. Fuentes-Weed's right femur with bone cement to which he did not add any antibiotics. (Lewis Dep., App. I, p. 34 ll. 4-11; p. 49 ll. 10-14.) At the time of surgery, Ms. Fuentes-Weed was 36 years old, 5' ¼" and weighed approximately 138 lbs. (Sonia Fuentes-Weed Medical Records ("Fuentes-Weed Medical Record), App. K, FUE/MED01800.)

Ms. Fuentes-Weed did well intra-operatively and had no significant post-operative complications. (*Id.,* FUE/MED01894-01896.) Zimmer's expert, Dr. Richard Berger, has noted

and is prepared to testify, however, that as is clearly evident from the initial post-operative x-rays, Ms. Fuentes-Weed never had an adequate cement mantle. (Berger Aff., App. A, ¶ 57.)

Ms. Fuentes-Weed did well following her right hip replacement. (Lewis Dep., App. I, p. 54 ll. 23-25; p. 57 ll. 20-24; Fuentes-Weed Dep., App. J, p. 63 ll. 13-24.) In fact, she was able to walk without pain, do aquatic therapy, walk up and down stairs normally and do household chores. (Id., p. 64 l. 3 – p. 65 l. 23; p. 67 ll. 2-10.) Although Ms. Fuentes-Weed's post-operative course was uneventful and she did have a good functioning hip for about a year, she began to develop pain in her thigh. (Id., p. 70 l. 18 – p. 71 l. 11; Berger Aff., App. A, ¶ 56.) On November 6, 1998, Dr. Moeckel (Plaintiff Lopes' implanting surgeon) examined her and told her that her x-rays showed a fracture of the cement column and evidence of some early loosening. (Fuentes-Weed Dep., App. J, p. 83 l. 14 – p. 84 l. 7; Deposition of Bruce Moeckel, M.D., Volume II, dated April 11, 2002 ("Moeckel Dep. Vol. II"), App. L, p. 40 ll. 1-9.) On March 16, 1999, Ms. Fuentes-Weed underwent a revision right total hip arthroplasty. (Grady-Benson Dep. Vol. II, App. E, p. 302 ll. 8-10.) At last report, she is extremely pleased with the result and basically has no hip pain. (Id., p. 306 ll. 10-12.)

Zimmer's experts will testify that Ms. Fuentes-Weed's stem loosened because of multiple voids in her cement mantle, both proximally and distally, which rendered it inadequate to hold her prosthesis. (Berger Aff., App. A, ¶ 57.) With normal activities, this allowed the prosthesis to move and not resist rotational forces. (Id.) The voids were caused by errors in placement of the cement and placement of the prosthesis within the cement. (Id.) In such an environment of a sub-optimal cement mantle, the cement cannot possibly withstand the normal forces brought to bear by the activities of daily living, regardless of the stem being used. (Id.) The result is failure of the cement mantle, with subsequent abrasion of the cement leading to osteolysis. (Id.)

### 4.     **Joann Lopes**

Dr. Moeckel began treating Ms. Lopes for left hip pain in 1993 and by December of 1994 she was experiencing significant pain and limitations in function. (Deposition of Bruce Moeckel, M.D., Volume I, dated November 29, 2001 ("Moeckel Dep. Vol. I"), App. M, p. 47 l. 23 – p. 49 l. 11.) Dr. Moeckel discussed the difference between cemented and cementless implants with Ms. Lopes prior to her left hip replacement surgery. (Deposition of Joann Lopes, dated October 24, 2001 ("Lopes Dep."), App. N, p. 28 ll. 6-24; Moeckel Dep. Vol. I, App. M, p. 49 ll. 12-21.) Although she had a cementless stem on the right side, Dr. Moeckel did not consider using a cementless implant for Ms. Lopes. (*Id.,* p. 49 ll. 12-18.) On March 21, 1995, Dr. Moeckel performed a left primary hybrid total hip arthroplasty on Ms. Lopes using a size 2 Centralign precoated femoral stem as the cemented femoral component. (Berger Aff., App. A, ¶ 50.) While the cement was being mixed, Dr. Moeckel put the prosthesis in the canal to see if it would fit, covering the prosthesis with blood. (*Id.*; Moeckel Dep. Vol. I, App. M, p. 81 l. 5 – p. 82 l. 13.) He then placed the prosthesis in a jar of antibiotic solution while he prepared the femoral canal. (*Id.;* Berger Aff., App. A, ¶ 50.) Ms. Lopes was 52 years old, 5'6.5" and weighed 171 lbs. at the time of her surgery. (*Id.,* ¶ 49.)

Ms. Lopes did well intra-operatively and had no significant post-operative complications. (*Id.,* ¶ 50.) Dr. Richard Berger, Zimmer's expert, has noted and is prepared to testify that her immediate post-operative x-ray shows a sub-optimal cement mantle with no cement on most of the lateral aspects of the prosthesis. (*Id.*) Distally the prosthesis is in direct contact with bone with no cement around it and there are significant voids proximally as well. (*Id.*)

Ms. Lopes did well following her left hip replacement.  (Lopes Dep., App. N, p. 32 ll. 8-13; p. 42 l. 22 – p. 43 l. 17; p. 43 l. 25 – p. 44 l. 4; p. 45 l. 18 – p. 46 l. 3.)  However, about three months after her surgery, she fell on her knees and suffered an injury to her left hip.  (*Id.,* p. 33 ll. 11-14; Moeckel Dep. Vol. I, App. M, p. 94 ll. 15-20.)  On January 13, 1997, Ms. Lopes complained to Dr. Moeckel of increasing problems and pain in her hip.  (*Id.,* p. 23 l. 17 – p. 25 l. 6.)  X-rays taken on that date showed signs of loosening.  (*Id.*)  On March 14, 1997, Ms. Lopes underwent a revision left total hip arthroplasty.  (Burstein Aff., App. H, ¶ 64; Lopes Dep., App. N, p. 51 ll. 3-10; Grady-Benson Dep. Vol. II, App. E, p. 288 ll. 5-8.)  Although Ms. Lopes has been on disability since April, 2001 due to scoliosis, her left hip has improved since the revision surgery.  (Lopes Dep., App. N, p. 7 l. 15 – p. 8 l. 3; p. 56 ll. 17-19; p. 61 ll. 20-22; Grady-Benson Dep. Vol. II, App. E, p. 294 l. 11-19; p. 295 l. 19 – p. 297 l. 12.)

Zimmer's experts will testify that Ms. Lopes' stem progressed to failure because of the sub-optimal cement mantle.  (Berger Aff., App. A, ¶ 51.)  The incomplete cement mantle was unable to hold the prosthesis.  (*Id.*)  Furthermore, the film of blood and antibiotics which was put on the prosthesis prior to insertion made it impossible for the cement to adhere to or interdigitate with the prosthesis.  (*Id.*)  The cement is designed to interdigitate in the prosthesis as well as directly bond to the precoating of the prosthesis.  (*Id.*)  Instead of early loosening, this case is one where the prosthesis never initially bonded properly to the cement.  (*Id.*, ¶ 52.)

**5.    James Johannsen**

Dr. Robert Fisher examined Mr. Johannsen on October 11, 1994 because he was experiencing severe pain in his right hip and had reduced mobility.  (Deposition of James Johannsen, dated April 16, 2002 ("Johannsen Dep."), App. O, p. 9 ll. 5-10; Deposition of Robert Fisher, M.D., dated April 11, 2002 ("Fisher Dep."), App. P, p. 37 l. 19 – p. 38 l. 20; p. 39 ll. 14-

16.)   On February 27, 1995, Dr. Fisher performed a hybrid total hip arthroplasty on Mr. Johannsen's right hip by implanting a size 2 Centralign Option femoral stem in Mr. Johannsen's femur with bone cement.  (Fisher Dep., App. P, p. 60 ll. 8-11; Berger Aff., App. A, ¶ 53.)  Mr. Johannsen was 56 years old, 6' and weighed 185 lbs. at the time of the surgery. (*Id.*)

Mr. Johannsen did well intra-operatively and had no significant post-operative complications.  (*Id.,* ¶ 54.)  Zimmer's expert, Dr. Richard Berger, has noted and is prepared to testify that immediate post-operative x-rays show the prosthesis without centralization and, therefore, in a slight varus alignment.  (*Id.*)  Further, early post-operative x-rays demonstrate an incomplete cement mantle with deficiencies distally and proximally.  (*Id.*)  The distal deficiencies were posterior and the proximal deficiencies were anterior.  (*Id.*)  This is a common problem in the positioning of a component without centralization with an anterolateral approach. (*Id.*)  The femur is implanted anteriorly, and therefore it is somewhat more challenging to get the prosthesis posterior enough upon insertion so as not to allow the proximal portion of the prosthesis to impinge anteriorly.  (*Id.*)  When this does impinge anteriorly, the distal portion of the prosthesis is forced posteriorly which further causes a cement mantle deficiency posteriorly as well.  (*Id.*)

Mr. Johannsen did well following his right hip replacement with the exception of some heterotopic ossification, which is a bone growth that led to much more stiffness in his hip than normally would be expected.  (Fisher Dep., App. P, p. 67 l. 18 – p. 68 l. 5.)  Within a few months, Mr. Johannsen had little pain and was satisfied with his implant.  (*Id.,* p. 68 ll. 23-25.) On March 3, 1998, Mr. Johannsen returned to Dr. Fisher for follow-up.  (*Id.,* p. 74 l. 25 – p. 75 l. 2.)  X-rays taken during that visit showed radiolucency consistent with stem loosening.  (*Id.,* p.

17

75 l. 24 – p. 77 l. 13.)  The entire prosthesis and cement mantle had migrated distally.  (Burstein Aff., App. H, ¶ 62.)  On June 15, 1998, Mr. Johannsen underwent a revision right total hip arthroplasty.  (Grady-Benson Dep. Vol. II, App. E, p. 311 ll. 16-18.)  Approximately a year after the revision surgery, Dr. Grady-Benson examined Mr. Johannsen and reported that he was doing quite well.  (*Id.,* p. 313 ll. 3-13.)

Zimmer's experts will testify that Mr. Johannsen never had an adequate cement mantle. (Berger Aff., App. A, ¶ 54.)  With this inadequate cement mantle, his particularly large size, and the small size of his femoral component, this imparted great strain to the surrounding cement mantle which was still intact.  (*Id.*)  This overstrained cement mantle, due to its incompleteness, then resulted in failure of the cement mantle.  (*Id.*)  Due to Mr. Johannsen's young age and vigorous lifestyle, the cement mantle failed relatively early and by 1998 severe lysis was noted in the exact same areas of the cement mantle that were deficient on the initial post-operative x-rays. (*Id.*)  Mr. Johannsen's early failure was the result of an inadequate cement mantle most likely caused by a lack of centralization and related inadequate implantation which left deficiencies anteriorly in the proximal femur and posteriorly in the distal part of the cement mantle.  (*Id.,* ¶ 55.)

## III.
## ARGUMENT

Consolidation is inappropriate under Rule 42(a) of the Federal Rules of Civil Procedure because these cases do not involve common questions of law or fact – the Plaintiffs are different; their femoral stems are different; and their surgeons and the conditions of their surgeries are different.  Thus, individualized case-specific factors will determine why and how the patients' implants loosened and whether a jury properly may attribute that loosening to an alleged defect

in Zimmer's product or instead to the multiple variables known to cause cemented femoral stems to loosen like factors related to the quality of the cement mantle and patient factors. Second, consolidating these cases will necessarily and improperly permit evidence about other dissimilar incidents to reach and sway the jury. Additionally, consolidation is not appropriate here because of the risk that the jury would not recognize the plaintiff-specific issues of fact and law and the resulting risk of prejudice to Zimmer at trial.

**A.      Consolidation Is Inappropriate Because Individual Issues Predominate**

Cases pending in the same court may be consolidated if they involve "common question[s] of law or fact." Fed. R. Civ. P. 42(a). The burden is on the party seeking consolidation to show common issues of law or fact; the burden is not on the party opposing consolidation to show divergence. *In re Repetitive Stress Injury Litig.*, 11 F.3d at 374. Although common questions of law or fact are prerequisites to consolidation, the mere existence of common issues does not require consolidation. *In re Consol. Parlodel Litig.*, 182 F.R.D. 441, 444 (D.N.J. 1998). Consolidation is inappropriate where individual issues predominate. *Id.* That "some evidence may be relevant in both cases…does not warrant consolidation of the two actions." *Sidari v. Orleans County*, 174 F.R.D. 275, 282 (W.D.N.Y. 1996).

Courts considering the question have held that products liability cases – and specifically medical device cases – should not be consolidated for trial because individual issues predominate over common issues. *See, e.g., In re Consol. Parlodel Litig.*, 182 F.R.D. at 446 (individual issues predominated in prescription drug liability case); *Hasman v. G.D. Searle & Co.*, 106 F.R.D. 459 (E.D. Mich. 1985) (same).

*Hasman* is instructive. In *Hasman*, three women filed lawsuits against the manufacturer of an intrauterine contraceptive device alleging that they each developed pelvic inflammatory

disease as a result of the use of the defendant's product.  *Id.* at 460.  In considering and rejecting the plaintiffs' request for a consolidated trial, the *Hasman* court held that "common issues of fact and law do not predominate in the three cases [because they] involve separate and unique medical, social, and sexual histories peculiar to each [plaintiff] and her sexual partners."  *Id.*  In addition, the *Hasman* court noted that "[t]he desire for judicial efficiency would not be served [by consolidation], since the unique details of each case would still need to be presented to the jury."  *Id.*

Here, as in *Hasman*, individual issues predominate.  For the jury to understand why each stem loosened will require the jury to understand how each stem was implanted and how each stem appeared on the post-operative x-rays.  The jury also will need to understand what the x-rays depict and why the condition of the cement mantle caused the stem to loosen.  The jury likewise will need to understand the individual activity level and other relevant medical history of each Plaintiff.  For these reasons, as in *Hasman*, individual issues predominate over the common issues such that judicial efficiency would not be served by consolidation.

The *Hasman* court equated the analysis of whether to consolidate medical product liability lawsuits with whether such cases ought to proceed as a class action.  *Id.* at 460-61.  Examining class certification decisions, as the *Hasman* court observed, reveals "a national trend to deny class certification in drug or medical product liability/personal injury cases."  *In re Am. Med. Sys.*, *Inc.*, 75 F.3d 1069, 1089 (6th Cir. 1996).[1]  *See, e.g., Benner v. Becton Dickinson &*

---

[1] Cases representative of the national trend toward the denial of class certification in drug and medical device cases include: *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426 (6th Cir. 1997) (drug); *In re St. Jude Med., Inc.*, No. 01-1396 (JRT/FLN), 2004 WL 1630786 (D. Minn. July 15, 2004) (heart valve); *In re Baycol Prods. Litig.*, 218 F.R.D. 197 (D. Minn. 2003) (drug); *Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590 (S.D. Ohio 2003) (drug); *Wethington v. Purdue Pharma LP*, 218 F.R.D. 577 (S.D. Ohio 2003) (drug); *In re Paxil Litig.*, 212 F.R.D. 539 (C.D. Cal. 2003) (drug); *Gevedon v. Purdue Pharma*, 212 F.R.D. 333 (E.D. Ky. 2002) (drug); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 208 F.R.D. 625 (W.D. Wash. 2002) (drug); *Foister v. Purdue Pharma L.P.*, No. Civ.A. 01-268-DCR, 2002 WL 1008608 (E.D. Ky. Feb. 26, 2002) (drug); *Neely v. Ethicon, Inc.*, No. 1:00-CV-00569, 1:01-CV-37,

*Co.*, 214 F.R.D. 157, 167 (S.D.N.Y. 2003) (denying class certification to class seeking damages arising from defendants' allegedly defective needle devices because "their claims arise from a substantially different course of events"); *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 66-67 (S.D.N.Y. 2002) (denying class certification in suit involving diabetes drug because "the issue whether Rezulin caused physical injury to a specific class member will depend on his or her unique characteristics"), *reconsideration denied by*, 224 F.R.D. 346 (2004).  Federal courts consistently find that the lack of commonality among the alleged injuries and alleged causes of injuries in drug and medical device product liability cases make proceeding as a class action inefficient and undesirable.

In fact, this Court already has rejected class treatment for these very same Centralign cases on precisely these grounds.  As the Court explained, the Dunns failed to satisfy their burden of showing that common issues predominated:

> The plaintiffs cannot satisfy their burden of establishing commonality because each class member's claim will involve a highly individualized inquiry regarding the cause of injury.  The injuries associated with the failure of a hip replacement unit, as well as the failure itself, could be caused by many different factors. . . .  Contrary to the plaintiffs' arguments, therefore, the liability question in each of the individual cases is not whether the defendant's product was defective.  Rather, central to each of these cases is an inquiry as to exactly what caused the injury at issue.  In a case such as this, the answer to that question necessarily involves a highly fact-specific individualized inquiry.  Therefore, the commonality requirement is not met.

March 27, 2002 Mem. Op. & Order at 4-5.

---

1:01-CV-38, 2001 WL 1090204 (E.D. Tex. Aug. 15, 2001) (medical sutures); *Woodell v. Proctor & Gamble Mfg. Co.*, No. Civ. 3:96-CV-2723-H, 1998 WL 686767 (N.D. Tex. Sept. 29. 1998) (drug); *Dhamer v. Bristol-Myers Squibb* Co., 183 F.R.D. 520 (N.D. Ill. 1998) (drug); *Fisher v. Bristol-Myers Squibb Co.*, 181 F.R.D. 365 (N.D. Ill. 1998) (drug); *In re Norplant Contraceptive Prods. Liab. Litig.*, 168 F.R.D. 577 (E.D. Tex. 1996) (contraceptive devices); *Martin v. Am. Med. Sys., Inc., Pfizer, Inc.*, No. IP 94-2067-C-H/G, 1995 WL 680630 (S.D. Ind. Oct. 25, 1995) (penile prostheses); and *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, Civ. A. 93-7074, 1995 WL 273597 (E.D. Pa. Feb. 22, 1995) (pedicle screws).

For the same reasons that this Court rejected the Dunns' motion for class certification, this Court should not consolidate these cases for trial. Every failure of total joint arthroplasty depends upon multiple factors; common issues of law and fact do not predominate, most notably because of the need for a multifactorial analysis to determine causation for each plaintiff; and consolidating cases, whether in the form of a class action or individual decisions to consolidate, is not a superior method for handling the disputes. The Plaintiffs' individual backgrounds and the specifics of their treatment are critical to a determination of whether Zimmer's products (1) are defective and (2) caused any of the Plaintiffs' respective alleged injuries.

For example, while Mrs. Dunn and Mr. Vino both were implanted with the same size and model stem by the same implanting surgeon (the only set of Plaintiffs who have all of these factors in common), they engaged in vastly different levels and types of activities – Mr. Vino's activities being stressful enough that Dr. Grady-Benson utilized a different surgical approach for him in order to help prevent dislocation – such that the issue of causation is highly individualized even as to them. The other Plaintiffs are even further apart because they have different model stems and/or implanting surgeons who used different surgical techniques (such as Dr. Moeckel's covering of the stem in blood and then soaking in antibiotic fluid) and unique patient factors, *e.g.*, Ms. Fuentes-Weed was only 36 years old at the time of her primary surgery. The sole common surgical or patient "factor" identified by Plaintiffs is a red herring because Dr. Grady-Benson's role as revision surgeon for all of the Plaintiffs has nothing whatsoever to do with any relevant issue of fact or law. That particular "factor" explains only how Plaintiffs' counsel wound up with these five cases.

**B.     Consolidation Would Necessitate The Improper Admission of Evidence of Dissimilar Incidents**

Consolidating these cases for trial will necessarily result in the jury hearing testimony regarding the loosenings experienced by Mrs. Dunn, Mr. Vino, Ms. Fuentes-Weed, Ms. Lopes, and Mr. Johannsen.  The law that would prohibit this in separate trial applies with equal force in a consolidated trial.  Evidence of other incidents may be relevant in a products liability action to prove a product's lack of safety or a party's notice of defects.  *J.B. Hunt Transport, Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 445 (8th Cir. 2001); *Barker v. Deere & Co.*, 60 F.3d 158, 162 (3d Cir. 1995).  Courts require the party seeking admission of this evidence, however, to demonstrate that the circumstances between the two incidents are substantially similar because admitting such evidence threatens to raise extraneous controversial issues, confuse the issues, and be more prejudicial than probative.  *J.B. Hunt*, 243 F.3d at 445; *Barker*, 60 F.3d at 162.  Plaintiffs must demonstrate that the events arise from the same cause.  *De Pue v. Sears, Roebuck & Co.,* 812 F. Supp. 750, 753 (W.D. Mich. 1992).  In short, evidence of dissimilar incidents is inadmissible and the burden of demonstrating similarity rests with the party seeking to introduce such evidence.  *Id.* at 752.

The court in *Hasman* recognized this tangible threat posed by consolidation, stating that "[i]f the unique circumstances of the cases are considered together in one trial, the jury's verdict might not be based on the merits of the individual cases but could potentially be a product of cumulative confusion and prejudice … since [the jurors] would be permitted to hear allegations of defects and adverse reactions not relevant to the particular plaintiff's case." *Hasman*, 106 F.R.D. at 461.  Consolidating the *Dunn*, *Fuentes-Weed*, *Johannsen*, *Lopes*, and *Vino* cases necessarily permits evidence of dissimilar incidents to be improperly admitted and to prejudice Zimmer.  In

other words, the jury may incorrectly consider the cumulative allegations of defect rather than Plaintiff specific facts when determining whether each Plaintiff has proved causation.

This problem is of particular concern here where the Plaintiffs were not even implanted with the same product. Three were implanted with the Centralign, the model with precoating about which Plaintiffs' experts developed their main theory of defect. The other two, however, were implanted with the Centralign Option which is not precoated. The risk that the jury will confuse the two different models of Centralign femoral stems is very real and the potential prejudice to Zimmer obvious: (1) the jury may not only consider improperly the cumulative allegations of defect for the Centralign in the *Dunn*, *Vino* and *Lopes* cases and the Centralign Option in the *Fuentes-Weed* and *Johannsen* cases, but might even cumulatively consider the allegations of defect in all 5 cases; and (2) the jury might fail to differentiate the two models when considering Plaintiffs' experts' precoating defect theory even though it only applies, if at all, in the *Dunn*, *Vino* and *Lopes* cases.

**C.    Plaintiffs' Motion For Consolidation Should Be Denied Because Zimmer Would Be Prejudiced By Consolidation**

Courts recognize that although consolidation may enhance judicial efficiency, "considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial…The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice." *In re Repetitive Stress Injury Litig.*, 11 F.3d at 374 (internal citation omitted). "[I]t is possible to go too far in the interests of expediency and to sacrifice basic fairness in the process." *Id.* Indeed, the Court's discretion to determine whether consolidation is appropriate is not unfettered; for example, efficiency concerns must be balanced against the potential for confusion or prejudice that might result from consolidation. *Solvent Chem. Co. v. E.I. DuPont De Nemours & Co.*, 242 F. Supp. 2d 196, 221 (W.D.N.Y. 2002)

(consolidation motion denied where movant offered cursory arguments based on conclusions rather than specifics). Thus, even if this Court finds that there are common issues of law and fact sufficient to justify the consolidation of these cases, consolidation nevertheless is inappropriate because it likely will confuse the jury and prejudice Zimmer.

Specifically, consolidation of these cases will require one jury to keep straight a multitude of facts including which of the five Plaintiffs was treated by which surgeon (Dr. Grady-Benson for two Plaintiffs vs. Dr. Moeckel vs. Dr. Lewis vs. Dr. Fisher) and for what indications (for example, Ms. Fuentes-Weed suffered from rheumatoid arthritis); the type of implant received by each Plaintiff (precoated, not precoated, with centralizers, without centralizers), and how it was implanted including surgical approach (anterolateral, posterior, etc.), placement in the femoral canal (varus, valgus, etc.),where an additive was used, and the quality of cement mantle achieved (complete voids vs. thin areas vs. areas where the stem is touching the bone vs. a complete failure to bond the stem and cement because of the presence of blood and antibiotic fluid, and the location in the mantle of those various problems); each Plaintiffs' bone type, bone quality and femoral canal size; each Plaintiffs' height, weight, age, and activity level (for example, Ms. Fuentes-Weed's unusually young age or Mr. Vino's kinetic activity level); and the content of conversations between each Plaintiff and his or her surgeon(s) regarding many of these issues.

Absent an accurate understanding of these specific facts as they relate to each Plaintiff, one jury cannot perform the job of making the highly individualized determination of which factor in an indisputably multifactorial analysis caused the loosening experienced by each Plaintiff. Simply put, given the number and variety of facts the jury will have to consider for each Plaintiff, it is highly likely that confusion will result if these cases are consolidated for trial.

Consolidation also would infringe upon Zimmer's right to a fair and impartial trial. As discussed above, these cases present individual issues of causation. If the unique circumstances of these cases are considered together in one trial, by one jury, there is a substantial possibility that the jury would not base its verdict on the merits of the individual cases and instead be swayed by evidence of more than one revision of a Centralign or Centralign Option stem and improperly conclude the stems are to blame. Any perceived gains in efficiency are outweighed by this potential confusion and resulting prejudice to Zimmer.

Any prejudice to Plaintiffs from denying consolidation and trying the cases separately is negligible. Given that all of Plaintiffs and their treating physicians reside in Connecticut, separate trials present no real hardship or inconvenience. The individual Plaintiffs will appear in Court regardless and may spend less time in the courtroom if the trials are separate. Plaintiffs' experts, Drs. Rose and Zeliger, reside in Massachusetts and New York. As pointed out by Plaintiffs when seeking to transfer a Minnesota action to Connecticut, both of those locales are neighboring states convenient to Connecticut. Of the parties, Zimmer will incur the overwhelming additional expense of separate trials and is willing to do so given the confusion and prejudice likely to result from consolidation.

**IV.**
**CONCLUSION**

For all the foregoing reasons, Zimmer respectfully requests that the Court deny Plaintiffs' motion to consolidate these matters for trial.

Dated:  June 17, 2005                    Respectfully submitted,

                                         **DEFENDANT, ZIMMER, INC.**


                                         _____
                                         By:  One of Its Attorneys

                                         Albert J. Dahm (ct 21710)
                                         Michael S. Elvin (ct 21711)
                                         Dahm & Elvin, LLP
                                         9604 Coldwater Road, Suite 201
                                         Fort Wayne, IN  46825
                                         Telephone:  (260) 497-6000
                                         Facsimile:   (260) 497-6019

                                         Francis H. Morrison III, (ct04200)
                                         Day Berry & Howard, LLP
                                         CityPlace I
                                         Hartford, CT  06103
                                         Telephone:  (860) 275-0100
                                         Facsimile:   (860) 275-0343
                                         E-mail:  fhmorrison@dbh.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 17th day of June, 2005, a copy of the foregoing was served on the following counsel of record by first-class mail, postage prepaid:

Robert I. Reardon, Jr.
The Reardon Law Firm
160 Hempstead Street
New London, CT  06320


_____
Francis H. Morrison III